[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12024

_____

D.C. Docket No. 1:16-cr-00243-ODE-JFK-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

NATHAN VAN BUREN,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 10, 2019)

Before MARTIN, ROSENBAUM, and BOGGS,[*] Circuit Judges.

ROSENBAUM, Circuit Judge:

Perhaps Dudley Field Malone said it best when he opined, "One good analogy is worth three hours' discussion."[1]  Or in this case, 15 pages of discussion. *See infra* at pp. 9–23.

Take, for example, this case.

"[A] lawsuit before a court" is a pretty big deal to most people.  But a generic "question" or "matter," in common usage, maybe not so much.

That impression may change, though, if we clarify what we mean by "question" or "matter" in a specific context by analogizing to something else.  So if we say that, for our purposes, to qualify as a "question" or a "matter," the question or matter must be of the same significance or scope as "a lawsuit before a court," a person would understand that we are not talking about just any old question or

---

[*] Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

[1] Richard Nordquist, *The Value of Analogies in Writing and Speech*, ThoughtCo., https://www.thoughtco.com/what-is-an-analogy-1691878 (last visited Oct. 8, 2019).  Along with Clarence Darrow, Dudley Field Malone defended John Scopes in the 1925 "Scopes Trial," formally known as *State v. Scopes*.  *Scopes Trial*, Encyclopaedia Britannica, https://www.britannica.com/event/Scopes-Trial (last visited Oct. 8, 2019) ("*Scopes Trial*"); *Malone's Trial Speech (Full Text)*, Historical Thinking Matters, http://historicalthinkingmatters.org/scopestrial/1/sources/44/fulltext/ (last visited Oct. 8, 2019) ("*Malone's Trial Speech*").  In that case, Tennessee, led by William Jennings Bryan, prosecuted Scopes for allegedly teaching evolution at a Tennessee high school.  *Scopes Trial*.  Scopes was convicted and fined $100.  *Scopes v. State*, 289 S.W. 363, 367 (Tenn. 1927).  The Tennessee Supreme Court then vacated the judgment since Tennessee law required a jury—not a judge—to assess any fine of more than $50.00, but in Scopes's case, the trial judge had done so.  *Id.*  The Tennessee law Scopes was accused of violating was ultimately repealed in 1967.  *Scopes Trial*.

matter; we are referring to only questions or matters on the same scale as "a lawsuit before a court." To use a metaphor, the analogy here is a bridge to understanding.

In this case, though, that bridge was never built. The government charged Nathan Van Buren with honest-services fraud (through bribery) for undertaking an "official act" in his capacity as a police officer, in exchange for money. At the close of the evidence, the district court instructed the jury that an "official act" is a decision or action on a "question" or "matter." But it did not inform the jury that the "question" or "matter" in this context must be comparable in scope to a lawsuit, hearing, or administrative determination. The jury convicted Van Buren.

Since the jury was not instructed with the crucial analogy limiting the definition of "question" or "matter," and because the government itself did not otherwise provide the missing bridge, we cannot be sure beyond a reasonable doubt that the jury convicted Van Buren of the offense that Congress criminalized when it enacted the honest-services-fraud and bribery statutes. For this reason, we must vacate Van Buren's honest-services-fraud conviction and remand for a new trial on that count. Van Buren was also charged with and convicted of computer fraud, and we affirm that conviction.

**I.**

3

Nathan Van Buren was a sergeant with the Cumming, Georgia, Police Department. In his capacity as a police officer, Van Buren came to know a man named Andrew Albo. Albo was a recent widower in his early sixties, who allegedly fancied younger women, including minors and prostitutes. He allegedly paid prostitutes to spend time with him and then often accused the women of stealing the money he gave them. At least one woman also alleged Albo surreptitiously recorded and harassed her. The Deputy Chief of Police in the Cumming Police Department believed that Albo "had a mental health condition" and considered Albo to be "very volatile," so he warned his officers to "be careful" with Albo.

Van Buren did not heed the Deputy Chief's caveat. Instead, he fostered a relationship with Albo. Van Buren, who first met Albo when he helped arrest Albo for providing alcohol to a minor, often handled the disputes between Albo and various women. At the time, Van Buren was grappling with financial difficulties, and Van Buren saw in Albo a chance to improve his situation. So Van Buren decided to ask Albo for a loan. To justify his request, Van Buren falsely claimed he needed $15,368 to settle his son's medical bills. He explained to Albo that he could not obtain a loan from a bank because he had shoddy credit.

Unbeknownst to Van Buren, however, Albo recorded their conversations. Albo presented the recording of Van Buren's loan solicitation to a detective in the

4

Forsyth County Sheriff's Office.   He told the detective that Van Buren was "shak[ing] him down for his money."  Albo's complaint drew the suspicion of the FBI, which created a sting operation to test how far Van Buren was willing to go for money.   Under the plan, Albo was to give Van Buren some cash, and in exchange, Albo was to ask Van Buren to tell him whether Carson, a woman he supposedly met at a strip club, was an undercover police officer.

Over a series of meetings and communications monitored and recorded by the FBI, Albo put the plan into action.  At lunch with Van Buren on August 21, 2015, Albo handed Van Buren an envelope with $5,000, telling him that this was "not the whole thing."  Van Buren offered to pay Albo back, but Albo waved that off, saying money was "not the issue."  Instead, Albo told Van Buren he had met a woman he liked at a strip club, but he needed to know if she was an undercover officer before he would pursue her further.  Van Buren agreed to help.

On August 31, Albo followed up on a previous discussion the pair had had about searching the woman's license plate in the police database.  During that conversation, Albo asked Van Buren whether he had had a chance to conduct the search yet.  Van Buren replied, "As far as running the plates, I don't—I don't think I got the right plate numbers from you."  Van Buren then told Albo to just text him the plate number, so Albo texted Van Buren "Pkp" and "1568," a fake license plate number created by the FBI.  Van Buren responded that he would look into the

5

matter, but he would need the "item" first. Albo replied that he had "2," and the pair scheduled to meet for lunch.

At lunch, Albo passed Van Buren an envelope containing $1,000 and apologized that he did not have $2,000, as they had discussed.[2] Van Buren asked Albo for the woman's name, explaining that "the car may not [be] registered to her." After learning that her name was Carson, Van Buren promised to attend to the matter promptly, and Albo responded, "then I will have all the money for you."

A few days later, on September 2, 2015, Van Buren searched for license-plate number PKP1568 in the Georgia Crime Information Center ("GCIC") database, an official government database maintained by the Georgia Bureau of Investigation ("GBI") and connected to the National Crime Information Center ("NCIC") maintained by the FBI. Van Buren then texted Albo to tell him he had information for him.

The next day, the FBI and GBI arrived at Van Buren's doorstep and conducted an interview with Van Buren. During the interview, Van Buren admitted he had concocted a fake story about his son's need for surgery to justify asking Albo for $15,000. He also conceded he had received a total of $6,000 from Albo. In addition, Van Buren confessed he had run a tag search for Albo and he

---

[2] The FBI actually gave Albo $2,000 to pass to Van Buren, so it appears Albo may have attempted to retain $1,000 for himself.

knew doing so was "wrong."   And while Van Buren asserted that $5,000 of the money he received from Albo was a "gift," he did reply "I mean he gave me $1,000" when asked if he received anything in exchange for running the tag. Finally, Van Buren conceded he understood the purpose of running the tag was to discover and reveal to Albo whether Carson was an undercover officer.

A federal grand jury charged Van Buren with one count of honest-services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, and one count of felony computer fraud, in violation of 18 U.S.C. § 1030.   At trial, the government presented the FBI's recordings of the interactions between Van Buren and Albo, and the jury convicted Van Buren of both counts.

Van Buren now appeals his convictions.  He argues the jury instructions the district court gave were incorrect, insufficient evidence exists to support his convictions, and the district court denied him his Sixth Amendment right to confront an adverse witness during the trial.

We agree that the jury instructions on the honest-services count were fatally flawed.   But we nevertheless conclude the government presented sufficient evidence to support a conviction on that count, so we remand that charge for a new trial.  On the other hand, we find no deficiencies with either the jury instructions for or the evidence supporting the computer-fraud charge.  Finally, we also reject

Van Buren's claim that he was denied his Sixth Amendment right to confront an adverse witness at trial.

## II.

We conduct a *de novo* review of the legal correctness of a jury instruction, but we review for abuse of discretion questions concerning the phrasing of an instruction. *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000). We likewise review for abuse of discretion a district court's refusal to give a requested jury instruction. *United States v. Carrasco*, 381 F.3d 1237, 1242 (11th Cir. 2004).

As for the sufficiency of evidence to support a conviction, we review that *de novo*, considering the evidence "in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007). Under this standard, we have explained that the jury's verdict survives "unless no trier of fact could have found guilt beyond a reasonable doubt." *United States v. Lyons*, 53 F.3d 1198, 1202 (11th Cir. 1995).

Finally, we review *de novo* a Confrontation Clause claim. *United States v. Curbelo*, 726 F.3d 1260, 1271–72 (11th Cir. 2013).

## III.

We divide our discussion into three parts. In Section A, we address Van Buren's objections as they pertain to his honest-services-fraud conviction. Section

B considers Van Buren's objections to his computer-fraud conviction. And finally, we examine Van Buren's remaining arguments in Section C.

## A.

We begin with honest-services fraud. The government theorized that Van Buren deprived the public of his honest services by accepting a bribe, as that act is defined by the federal bribery statute, 18 U.S.C. § 201. Under § 201, a public official may not seek or receive anything of value in return for "being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2). The statute defines an "official act," in turn, as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id.* § 201 (a)(3).

The controversy here centers on how a jury should be instructed regarding what constitutes an "official act." As relevant on appeal, the district court instructed the jury as follows on the honest-services-fraud count:

> With respect to Count 2, you are instructed that it is a federal crime to use interstate wire, radio or television communications to carry out a scheme to defraud someone else of a right to honest services. The Defendant can be found guilty of this crime only if all of the following facts are proven beyond a reasonable doubt:
>
> First, that the Defendant knowingly devised or participated in a scheme to fraudulently deprive the public of the right to honest services of the Defendant through bribery or kickbacks. Second, that the Defendant did so with an intent to defraud the public of the right

9

to the Defendant's honest services; and, third, that the Defendant transmitted or caused to be transmitted by wire, radio or television some communication in interstate commerce to help carry out the scheme to defraud.

. . .

Bribery and kickbacks involve the exchanges of a thing or things of value for *official action* by a public official. Bribery and kickbacks also include solicitation of things of value in exchange for official action, even if the thing of value is not accepted or the *official action* is not performed, that is, bribery and kickbacks include the public official's solicitation or agreement to accept something of value, whether tangible or intangible, in exchange for an *official act*, whether or not the payor actually provides the thing of value, and whether or not the public official ultimately performs the requested *official action*.

***To qualify as an official act, the public official must have made a decision or taken an action on a question or matter. The question or matter must involve the formal exercise of governmental power. It must also be something specific which requires particular attention to the question or matter by the public official.***

 (emphasis added).

Van Buren objected, arguing that the district court should have instead instructed the jury this way:

To qualify as an official act, the public official must have [made a decision or taken an action] . . . on a question, matter, **cause, suit, proceeding, or controversy**. Further, the question, matter, **cause, suit, proceeding, or controversy** must involve the formal exercise of governmental power. **It must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee**. It must also be something specific which requires particular attention by a public official.

10

**The public official's [decision or action] . . . on that question, matter, cause, suit, proceeding, or controversy may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official.  But setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—is not an official act.**

(emphases added).[3]

A district court's refusal to provide a requested instruction constitutes reversible error if (1) the requested instruction was legally correct, (2) the content of the requested instruction was not otherwise covered, and (3) the omitted instruction was so vital that its absence seriously impaired the defense.  *United States v. Opdahl*, 930 F.2d 1530, 1533 (11th Cir. 1991).  After careful review, we conclude that all these conditions are present here, and the district court committed reversible error in declining to instruct the jury that an "official act" "must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."  To explain why, we start with *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the case on which Van Buren relied in requesting the refused instruction.

**i.**

---

[3] For convenience, we have underlined and bolded the parts of Van Buren's requested instruction that do not appear in the corresponding italicized and bolded instructions the district court gave the jury.

Like Van Buren's case, *McDonnell* also involved a prosecution for honest-services fraud where the government defined the crime by reference to the bribery statute. *McDonnell*, 136 S. Ct. at 2365. There, the government indicted former Virginia Governor Robert McDonnell and his wife, Maureen McDonnell, for bribery. *Id.* at 2361. The couple had accepted about $175,000 in loans, gifts, and other benefits from "the CEO of Star Scientific, a Virginia-based company that developed and marketed Anatabloc, a nutritional supplement made from anatabine, a compound found in tobacco." *Id.* at 2361–62. In exchange, the government alleged, McDonnell had committed at least five "official acts" for Star Scientific and its CEO:

> (1) he had arranged meetings between Star Scientific's CEO and Virginia government officials to discuss and promote Star Scientific's interests;
>
> (2) he had hosted and attended events at the Governor's Mansion designed to encourage Virginia university researchers to study and promote Star Scientific's products;
>
> (3) he had contacted other government officials to encourage Virginia state research universities to initiate studies favorable to Star Scientific;
>
> (4) he had promoted Star Scientific by allowing its CEO to invite people to exclusive events at the Governor's Mansion; and
>
> (5) he had recommended that senior government officials in the Governor's office meet with executives from Star Scientific.

*Id.* at 2365–66.

12

The district court there instructed the jury that "official acts" are those that "a public official customarily performs," including acts "that have been clearly established by settled practice as part of a public official's position" and acts that further long term goals or contribute to "a series of steps to exercise influence or achieve an end." *Id.* at 2366, 2373. So charged, the jury convicted McDonnell of honest-services fraud, and the Fourth Circuit affirmed. The Supreme Court, though, vacated that conviction because the instructions incorrectly described an "official act." *Id.* at 2375.

In explaining why, the Court observed that the words "cause, suit, proceeding or controversy" in § 201(a)(3) "connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *Id.* at 2368. With that in mind, the Supreme Court applied the interpretive canon *noscitur a sociis* ("a word is known by the company it keeps") to conclude that a "question or matter"—words that appear in the same series of items as "cause, suit, proceeding or controversy" in the definition of "official act"—must likewise "be similar in nature to a cause, suit, proceeding or controversy." *Id.* at 2368-69 (citation and internal quotation marks omitted). Confining the plain meaning of "question" or "matter" in this way makes sense, explained the Court, since otherwise, "the terms 'cause, suit, proceeding or controversy' would serve no role in the statute—every 'cause, suit, proceeding or controversy' would also be a

13

'question' or 'matter.'"  *Id.* at 2369.  The Supreme Court also cautioned against considering the question, matter, cause, suit, proceeding or controversy at too high a level of generality;  rather, the Court reasoned, any qualifying question, matter, cause, suit, proceeding, or controversy must be "focused and concrete."  *Id.*

And to give further color to the phrase "question, matter, cause, suit, proceeding or controversy," *McDonnell* looked to the surrounding text.  "Pending" and "may by law be brought," *McDonnell* explained, "suggest something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  *Id.*  As for "may *by law* be brought," that implies "something within the specific duties of an official's position."  *Id.*  And the word "any" indicates that "the matter may be pending either before the public official who is performing the official act, or before another public official."  *Id.*

Putting it all together, "question, matter, cause, suit, proceeding or controversy" must be a formal government action analogous to a lawsuit, hearing, or administrative determination that can be pending before any public official.  It must be specific and concrete, fall within the duties of an official's position, and be relatively circumscribed, capable of being put on an agenda, tracked for progress, and checked off as complete.

The *McDonnell* Court then applied this definition to the facts of its case. "The first inquiry," the Court said, is whether the activity at issue—a meeting, call, or event—is itself a "question, matter, cause, suit, proceeding or controversy." *Id.* at 2368. Since the Court determined the activity was not, it moved on to the next inquiry: whether the meeting, call, or event could "qualify as a 'decision or action' *on* a different question or matter." *Id.* at 2369.

Answering that question, of course, required the Court to first identify the different question or matter being acted on. *Id.* The Court began by explaining that something like "Virginia business and economic development" could not constitute an underlying matter because it is defined at too high a level of generality and is not something that could be "pending" before a public official, as the Court has construed "pending." *Id.*

Then the Court turned to the Fourth Circuit's formulation of the underlying questions:

(1) "whether researchers at any of Virginia's state universities would initiate a study of Anatabloc";

(2) "whether the state-created Tobacco Indemnification and Community Revitalization Commission would allocate grant money for the study of anatabine"; and

(3) "whether the health insurance plan for state employees in Virginia would include Anatabloc as a covered drug."

15

*Id.* at 2369–70 (citation and internal quotation marks omitted).  The Court agreed with that formulation of the questions.  Each of those questions, *McDonnell* explained, "is focused and concrete, and each involves a formal exercise of governmental power that is similar in nature to a lawsuit, administrative determination, or hearing."  *Id.* at 2370.  Still, merely setting up a meeting, hosting an event, or calling another official—while actions related to those questions— ultimately could not qualify as actions or decisions *on* those questions.  Something more was needed:  for example, a decision to actually initiate a research study or to provide advice to another official with the intent to cause the other official to perform an official act.  *Id.*

Then the Supreme Court turned to the jury instructions the district court gave.  Based on its interpretation of the "official act" language in § 201, *McDonnell* concluded that the jury instructions were "significantly overinclusive." *Id.* at 2373–75.  In particular, the district court had instructed the jury that an "official act" includes "actions that have been clearly established by settled practice as part of a public official's position" and could include acts designed to contribute to a long-term result.  *Id.* at 2373.  But that description did not inform the jury that an official act must be *on* a "question, matter, cause, suit, proceeding or controversy," nor did it explain how to identify such an underlying "question, matter, cause, suit, proceeding or controversy."  *Id.* at 2374.  So while the Fourth

16

Circuit noted possible questions on which McDonnell had perhaps acted, nothing guaranteed that the jury found those questions on its own; instead, the Supreme Court was concerned that the jury may have "convicted Governor McDonnell without finding that he agreed to make a decision or take an action on a properly defined question, matter, cause, suit, proceeding or controversy." *Id.* at 2374–75 (internal quotation marks omitted). As a result, the Court concluded the error in the instructions was not harmless beyond a reasonable doubt. *Id.*

The Supreme Court left it to the Fourth Circuit to decide whether to dismiss the case or remand for a new trial. To make this determination, the Fourth Circuit was to ascertain whether enough evidence existed to convict McDonnell of honest-services fraud, given the Supreme Court's clarification of "official act." If so, the Fourth Circuit could remand for a new trial. Otherwise, it was to dismiss the charge. *Id.* at 2375.

**ii.**

*McDonnell* compels us to conclude that the instructions here were erroneous, the error was not harmless, and a remand for a new trial on the honest-services charge is the appropriate remedy.

As we have noted, the district court instructed jurors that an "official act" involves a decision or action "on a question or matter" and that this question or matter "must involve the formal exercise of governmental power" and be

17

"something specific which requires particular attention." But the court declined to give Van Buren's requested instruction that the question or matter "must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee," reasoning that that instruction was inapplicable to Van Buren's case and would only confuse the jury.

This was error. As we have explained, *McDonnell* concluded that the words "cause," "suit," "proceeding," and "controversy" "connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *McDonnell*, 136 S. Ct. at 2368. So a "question" or "matter"—housed in the same statutory phrase as "cause," "suit," "proceeding," and "controversy"—similarly must involve a formal action of the same gravity as a lawsuit, hearing, or administrative determination. That analogy—"such as a lawsuit, hearing, or administrative determination"—is critical to understanding the meaning of "question" or "matter" as those terms are used in the federal bribery statute. And because the qualification that the "question or matter" be similar in nature to a "lawsuit, hearing, or administrative determination" is the product of statutory interpretation, not of *McDonnell*'s facts, this qualification applies with equal force to Van Buren's case.

This qualification also provides crucial context for what "formal exercise of governmental power" means, as that phrase is used in the district court's jury

18

instruction. Without this analogy limiting the meaning of "question" or "matter," a "formal exercise of governmental power" could mean anything that a public official does that falls within the scope of the official's duties. Omitting the analogy unravels essential statutory limitations that the Supreme Court identified concerning the meaning of "official act."

Naturally, removing those protections opens the door to the same harmful effects that the Supreme Court described in *McDonnell*. Although the district court here informed the jury that the "question" or "matter" had to be a "formal exercise of governmental power," that phrase did not illuminate the scale or nature of the "question" or "matter" that would qualify, since it was not accompanied by an instruction that the exercise of governmental power must be comparable to a lawsuit, agency determination, or committee hearing. As in *McDonnell*, then, the instructions "provided no assurance that the jury reached its verdict after finding" a qualifying underlying question or matter. 136 S. Ct. at 2374.

And the government's arguments only reinforce our doubt that the jury identified a proper "question" or "matter" before convicting Van Buren. The government does not argue that the license-plate search is itself the question or matter, but rather that the search was an action *on* a question or matter. But the government's formulation of the "question" or "matter" at issue reveals its own misinterpretation of those terms as they are used in the federal bribery statute.

Specifically, the government contends that the underlying "question" is "whether to provide information to Albo about whether a woman was working as an undercover police officer."

That, of course, is not a "question" or "matter" comparable to a lawsuit, hearing, or administrative determination. Nor is it a "question" or "matter" like the ones the Supreme Court identified as similar in *McDonnell*. As we have noted, those questions asked whether to initiate a study at a state university, whether to allocate grant money for a particular study, and whether to include something as a covered drug. *McDonnell*, 136 S. Ct. at 2370. Each of these three "questions" is a formal exercise of governmental power that is similar in nature to, say, an administrative determination. Merely divulging information to a civilian is not. And if the government could not identify a proper question on which Van Buren acted, we can have no confidence that the jury did.

The government's incorrect formulation of the "question" or "matter" here also threatens to transform any improper disclosure by a public official into an "official act" under the bribery statute, regardless of whether the disclosure was meant to influence a formal exercise of governmental power that is analogous to a lawsuit, hearing, or administrative determination. But as *McDonnell* reminded us, "a statute in this field that can linguistically be interpreted to be either a meat axe

20

or a scalpel should reasonably be taken to be the latter." 136 S. Ct. at 2373 (citing *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 408, 412 (1999)).

Not only was the government's "question" incorrect, but the jury instructions also prevented Van Buren from pointing out the government's mistake. Because the jury was not told that the "question" or "matter" must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee, Van Buren had no effective way to highlight the government's failure to identify an appropriate "question" on those grounds. Had the jury been properly instructed, Van Buren very well could have successfully made that argument. So we cannot say the error was harmless. *See United States v. Browne*, 505 F.3d 1229, 1267–68 (11th Cir. 2007) ("The correct focus of harmless-error analysis is whether it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty in the absence of the error.").

In sum, Van Buren's requested jury instruction that the question or matter "must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee" was correct and would have conveyed critical information that the instructions did not otherwise cover. Its omission deprived Van Buren of a potent argument and allowed the jury to convict him without identifying a qualifying "question" or "matter" on which he acted.

21

We therefore vacate Van Buren's honest-services-fraud conviction. *Opdahl*, 930 F.2d at 1533 (explaining that failure to give a requested instruction is reversible if the instruction is correct, not otherwise covered, and important enough that its omission seriously impaired the defense). To the extent our prior precedent holds that an "official act" is simply "[e]very action that is within the range of official duty," *see United States v. Moore*, 525 F.3d 1033, 1041 (11th Cir. 2008) (quoting *United States v. Birdsall*, 233 U.S. 223, 230 (1914)), without regard to whether that action is on a proper "question, matter, cause, suit, proceeding or controversy," it has clearly been abrogated by *McDonnell*. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (showing how an intervening decision by the Supreme Court abrogates clearly inconsistent precedent).

Nevertheless, our vacatur of Van Buren's honest-services-fraud conviction does not end our inquiry into that charge. Van Buren also argues the government failed to present sufficient evidence to convict him of bribery, raising the question of whether we should remand for retrial or dismiss the charge. *McDonnell*, 136 S. Ct. at 2375. After examining the evidence, we conclude a retrial is warranted.

Had the government identified a correct question or matter, the evidence, when viewed in the light most favorable to the government, was sufficient to allow a reasonable juror to conclude that Van Buren was guilty of bribery beyond a reasonable doubt. *Taylor*, 480 F.3d at 1026 (describing standard of review on a

22

sufficiency-of-the-evidence challenge). Among other things, Van Buren confessed to the FBI and GBI that he ran the tag search for money. He also said that he knew the purpose of the search was to discover and reveal whether Carson, the woman Albo allegedly met at the club, was an undercover officer. If the government had identified the underlying matter as something like an investigation into illegal activity, such as prostitution, at the strip club, it may have been able to prove its case.

Such an investigation would have been a specific, formal government action, within the ambit of police activity, that is comparable to a lawsuit, hearing, or administrative determination. It could have been put on an agenda, tracked for progress, and marked off as complete. And Van Buren could have acted *on* the underlying investigation because he could have influenced its findings had he identified an undercover agent in his tag search and revealed her cover to Albo. That Carson did not exist does not matter. The government presented evidence that Van Buren was fully prepared, and acted, to compromise a potential investigation, in exchange for money. His guilt or innocence cannot turn on whether he was lucky enough that the person he searched for fortuitously did not exist or that no investigation of the strip club was actually occurring.

For these reasons, we remand for a new trial on the honest-services-fraud count. *McDonnell*, 136 S. Ct. at 2375.

**B.**

Next, we turn to Van Buren's computer-fraud conviction. For searching Carson's tag in the GCIC system, Van Buren was convicted of violating the Computer Fraud and Abuse Act, which makes it a crime to obtain "information from any protected computer" by "intentionally access[ing] a computer without authorization or exceed[ing] authorized access." 18 U.S.C. §1030(a)(2)(C). Van Buren contends that two problems specific to his computer-fraud charge undermine his conviction. He argues, first, that the district court should have instructed the jury on the lesser-included offense of misdemeanor computer fraud, and, second, that the government did not present enough evidence to sustain his conviction. We are not persuaded.

**i.**

The computer-fraud crime of which Van Buren was convicted is a misdemeanor unless, among other things, it was committed for private financial gain, in which case it is a felony. 18 U.S.C. § 1030(c)(2). The district court instructed the jury on only felony computer fraud: it told the jury that to return a guilty verdict against Van Buren, it must conclude that Van Buren acted for private financial gain. But it did not raise the possibility that Van Buren could still be convicted of the lesser-included, misdemeanor version of the offense, should the

24

jury conclude the financial element was missing.  Van Buren argues that this omission of the misdemeanor instruction amounted to reversible error.

To succeed on his claim, Van Buren must meet a two-part test.  First, he must satisfy the "elements test" by proving that the charged offense encompasses all the elements of the lesser offense.  Here, that is not a problem.  Indeed, the parties do not dispute that the "elements test" is satisfied:  the sole difference between the felony and misdemeanor versions of crime, as relevant to Van Buren's case, is the private-financial-gain element.  But Van Buren must also meet a second requirement:  he must demonstrate that the evidence would have allowed a rational jury to acquit him of the greater offense while convicting him of the lesser. *United States v. Whitman*, 887 F.3d 1240, 1246–47 (11th Cir. 2018), *cert. denied,* 139 S. Ct. 1276, 203 (2019).  This he cannot do.

Van Buren's problem arises from the fact that the record contains no evidence that Van Buren engaged in computer access for any reason other than financial gain.  As an initial matter, Van Buren's argument that there is evidence he ran the search as part of a good-faith effort to investigate Albo's other troubles with women does him no good:  if Van Buren truly ran the PKP1568 tag as part of a legitimate good-faith investigation, that would absolve him of computer fraud entirely, since he would just be doing his job.  As a result, even assuming a jury could find he acted in good faith, that would not support the inference that a

25

rational jury could have convicted him of misdemeanor computer fraud.  Plus, the record lacks any evidence that Van Buren ran the PKP1568 tag as part of a good-faith investigation.

Perhaps sensing the hole in this argument, Van Buren alternatively urges that the money he received was only a loan.  Even if we call the money Van Buren received a "loan," though, a loan still confers financial benefit.  As Van Buren admitted, he needed money to cover his bills but was having trouble securing a loan because of his poor credit.  So receiving what appears to be an interest-free cash loan that he could use to cover any immediate needs counts as financial gain.

Van Buren next claims the record contains evidence that he ran the GCIC search before Albo offered him money to do so.  This "evidence" appears to consist of the brief phone call between Van Buren and Albo on the morning of August 31, 2015, when Albo asked Van Buren if he had run the license plate yet, and Van Buren replied, "I don't—I don't think I got the right plate numbers from you."  Van Buren suggests this conversation demonstrates that Van Buren had already run a search on Carson's plate before receiving the $1,000 payment, so he had no financial motive for the unauthorized search.

But the rest of the record frustrates Van Buren's attempt to capitalize on his stray remark.  First, on August 21—ten days before the August 31 conversation on which Van Buren relies—Van Buren had already received $5,000 from Albo and

agreed in principle to investigate Carson. And second, even setting aside those facts, which independently establish financial gain, the record reflects that Albo did not provide Van Buren with Carson's purported plate number for the first time until *after* the August 31 conversation. In fact, Van Buren only ever tried to run Carson's alleged tag number once, and that occurred on September 2, 2015—again, after the August 31 conversation. So on this record, Van Buren's "I don't think I got the right plate numbers from you" comment can be understood to mean only that he had not yet received Carson's license-plate information from Albo.

Finally, Van Buren tries to show that a jury could have determined he wrongly accessed the computer for reasons other than financial gain: he highlights a comment he made to Albo during a recorded conversation on August 26, 2015. At that time, Van Buren stated, "I'm not charging for helping you out." In that convoluted exchange, though, Van Buren simultaneously claimed he was not looking into Carson for money, while he also probed whether Albo would continue to "help [him] out with the rest of the medical bills." Van Buren refers to the "rest" of the bills, of course, because he had already received $5,000 of the $15,368 he allegedly needed and had already agreed to research Carson's identity by that point. And later, Van Buren texted Albo for more money as a condition of running the search and took another $1,000. But perhaps most significantly, Van

Buren expressly confessed to the FBI and GBI that he ran the tag search for money.

In short, no jury could have rationally believed that if Van Buren searched Carson's tag in the GCIC system on September 2, 2015, he did it for some non-financial, unidentified reason. The district court therefore did not abuse its discretion in declining to give the misdemeanor-computer-fraud instruction.

### ii.

We next consider Van Buren's contention that the evidence did not sufficiently support his conviction for computer fraud. Although styled as a sufficiency-of-the-evidence challenge, the animating force behind this argument is an appeal to overrule *United States v. Rodriguez*, 628 F.3d 1258 (11th Cir. 2010), where we held that even a person with authority to access a computer can be guilty of computer fraud if that person subsequently misuses the computer.

Rodriguez, the defendant in that case, was a Social Security Administration ("SSA") employee who, for personal reasons, used the SSA's computer database to research information such as birth dates and home addresses of 17 people. *Rodriguez*, 628 F.3d at 1260. This violated SSA policy, which prohibited employees from obtaining information from SSA databases without a legitimate business reason. *Id.* Rodriguez was convicted of computer fraud.

On appeal, though, he argued he was innocent because "he accessed only databases that he was authorized to use," albeit for inappropriate reasons. *Id.* at 1263. We rejected that argument. We noted that the computer-fraud statute defines "exceeds authorized access," as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled [so] to obtain or alter." *Id.* at 1263 (quoting § 1030(e)(6)). Then we determined that the defendant had "exceeded his authorized access and violated the [computer-fraud statute] when he obtained [the victims'] personal information *for a nonbusiness reason*." *Id.* (emphasis added).

Van Buren points out that our sister circuits have criticized *Rodriguez*'s interpretation of "exceeds authorized access," since it purportedly allows employers or other parties to legislate what counts as criminal behavior through their internal policies or their terms of use. Echoing the defendant's argument in *Rodriguez*, Van Buren alleges that he is innocent of computer fraud because he accessed only databases that he was authorized to use, even though he did so for an inappropriate reason.

We acknowledge that other courts have rejected *Rodriguez*'s interpretation of "exceeds authorized access." *See, e.g.*, *United States v. Nosal*, 676 F.3d 854, 860 (9th Cir. 2012) (en banc) (noting that activities like "[Google]-chatting with friends, playing games, shopping or watching sports highlights" on a work

29

computer are routinely prohibited by computer-use policies, and worrying that "under the broad interpretation of the [computer-fraud statute], such minor dalliances would become federal crimes"); *United States v. Valle*, 807 F.3d 508, 528 (2d Cir. 2015) ("While the Government might promise that it would not prosecute an individual for checking Facebook at work, we are not at liberty to take prosecutors at their word in such matters."). But under our prior-precedent rule, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *Archer*, 531 F.3d at 1352. Since Van Buren has identified no Supreme Court or en banc decision of this Circuit that abrogates *Rodriguez*, we must continue to follow it.

And under *Rodriguez*, there is no question that the record contained enough evidence for a jury to convict Van Buren of computer fraud. The evidence showed that Van Buren accepted $6,000 and agreed to investigate Carson. It demonstrated that Van Buren searched what was supposed to be Carson's tag in the GCIC database. At trial, one of the assistant deputy directors of the GCIC testified that the database is supposed to be used for law-enforcement purposes only and that officers are trained on the proper and improper uses of the system. Van Buren also admitted to the FBI and GBI that he knew it was "wrong" to run the tag search and that he had done so for money. And as we have noted, *Rodriguez* previously

30

rejected the contention that misusing databases a defendant lawfully can access does not constitute computer fraud. Taken in the light most favorable to the verdict, under our binding Circuit precedent, a jury could have found beyond a reasonable doubt that Van Buren committed computer fraud for financial gain.

## C.

Van Buren raises two remaining arguments: one challenging the district court's decision to decline giving good-faith instructions to the jury, and the other asserting that his Sixth Amendment right to confront Albo was violated at trial. We address each in turn.

### i.

First, Van Buren contends the district court abused its discretion in refusing to give his requested good-faith instructions. Specifically, Van Buren asked for two good-faith instructions, one explaining that good faith is a complete defense to any charge that requires willfulness and one explaining that good faith is a complete defense to any charge that requires intent to defraud. The district court declined to give those instructions, reasoning that the record lacked any evidentiary basis to support them. That decision fell within the proper scope of the district court's discretion.

As we have explained, a district court's refusal to provide a requested instruction is reversible error if (1) the requested instruction was legally correct, (2)

31

the content of the requested instruction was not otherwise covered, and (3) the omitted instruction was so vital that its absence seriously impaired the defense. *Opdahl*, 930 F.2d at 1533. A good-faith instruction is legally correct if *any* foundation in evidence supports it. *United States v. Martinelli*, 454 F.3d 1300, 1315 (11th Cir. 2006). But Van Buren has not met even this minimal evidentiary bar.

He points out that in the past, he and other officers had searched license plates Albo had provided, as part of legitimate investigations into Albo's issues with other women. That's true. What's missing, though, is *any* evidence that Van Buren searched the particular tag at issue this time—PKP1568—for a law-enforcement purpose. So Van Buren's requested instruction is not "correct" because no evidentiary basis supports it.

Nor has Van Buren showed that omission of the good-faith instructions seriously impaired his defense, since even assuming that any trace of good faith could be squeezed from the record, it would have been negligible in the face of the overwhelming evidence of wrongdoing. *See Martinelli*, 454 F.3d at 1316 (holding that the absence of a good-faith instruction did not seriously impair the defense, since "the evidence of fraud . . . was overwhelming and the evidence of good faith was slight.").

**ii.**

32

Finally, Van Buren argues he was deprived of his Sixth Amendment right to confront adverse witnesses. Albo did not testify at Van Buren's trial because he allegedly had fled to Italy. In Albo's absence, the government played the recordings that the FBI had taped of the conversations between Albo and Van Buren. Van Buren contends that the admission of Albo's statements on the recordings violated his constitutional right to confront Albo. We find no merit to that argument.

The Sixth Amendment's Confrontation Clause guarantees a criminal defendant "the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This usually means that the defendant must have an opportunity to cross-examine an adverse witness at trial before that witness's statements may be admitted. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). But significantly, the Confrontation Clause does not block statements that are used "for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n.9.

For instance, in *United States v. Price*, 792 F.2d 994 (11th Cir. 1986), the government relied on recordings between the defendant and another individual, since the person who made the recordings had passed away before trial. *Id.* at 996. The defendant asserted that admitting the other person's statements on the recording violated his Confrontation Clause right. We rejected that argument, finding that "[t]he single purpose for admitting the [other person's] statements was

33

to make understandable to the jury the statements made by [the defendant] himself." *Id.* at 997. Put simply, the statements in question were not offered for their truth, so the defendant's "Sixth Amendment right of confrontation and to present a defense was not violated by the introduction of the tapes into evidence." *Id.*

The same is true here: Albo's statements were admitted only to provide context for Van Buren's statements and to show their effect on Van Buren. For example, whether Albo was actually interested in Carson or whether he actually wanted to learn her real identity was not at issue here; the truth or falsity of those claims did not tend to make it more or less likely that Van Buren had committed a charged crime. Rather, the government offered those statements solely to put into context Van Buren's remarks and actions. Because none of Albo's recorded statements was offered for its truth, none was subject to the Confrontation Clause.

## IV.

For all the above reasons, we vacate Van Buren's honest-services-fraud conviction and remand for a new trial on that charge. We affirm his computer-fraud conviction.

**VACATED AND REMANDED IN PART; AFFIRMED IN PART.**