RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0301p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ROYAL TRUCK & TRAILER SALES AND SERVICE, INC.,
                              *Plaintiff-Appellant*,

                    *v.*

MIKE KRAFT; KELLY MATTHEWS,
                              *Defendants-Appellees*.

⎫
⎪
⎪
⎪
⎬   No. 19-1235
⎪
⎪
⎪
⎭

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Port Huron.
No. 3:18-cv-10986—Robert H. Cleland, District Judge.

Argued:  December 12, 2019

Decided and Filed:  September 9, 2020

Before:  GILMAN, KETHLEDGE, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Anthony M. Sciara, KOTZ SANGSER WYSOCKI P.C., Detroit, Michigan, for Appellant.  Salvatore J. Vitale, VARNUM LLP, Novi, Michigan, for Appellees.  **ON BRIEF:** Anthony M. Sciara, Mark F.C. Johnson, KOTZ SANGSER WYSOCKI P.C., Detroit, Michigan, for Appellant.  Salvatore J. Vitale, Richard T. Hewlett, VARNUM LLP, Novi, Michigan, for Appellees.

───────────────

## OPINION

───────────────

CHAD A. READLER, Circuit Judge.  Following the abrupt resignation of two employees, Royal Truck & Trailer discovered that the employees, prior to resigning, had

accessed confidential company information from their company-issued computers and cell phones and then utilized the information in violation of company policy. Royal responded by filing suit against the employees, alleging violations of the federal Computer Fraud and Abuse Act (CFAA) as well as Michigan law.

The conduct at issue might violate company policy, state law, perhaps even another federal law. But because Royal concedes that the employees were authorized to access the information in question, it has failed to satisfy the statutory requirements for stating a claim under the CFAA. Accordingly, we **AFFIRM** the district court's judgment.

## BACKGROUND

Royal employed Defendants Mike Kraft and Kelly Matthews as a part of the company's sales team. In conjunction with their employment, Defendants received a copy of Royal's employee handbook. With respect to the use of company equipment, the handbook prohibited a range of conduct, including: personal activities; unauthorized use, retention, or disclosure of any of Royal's resources or property; and sending or posting trade secrets or proprietary information outside the organization. Royal also had a cell phone "GPS Tracking Policy." In accordance with that policy, "[e]mployees may not disable or interfere with the GPS (or any other) functions on a company issued cell phone," nor may employees "remove any software, functions or apps." R.8, Am. Compl., ¶ 18.

Kraft and Matthews abruptly resigned from Royal to take up employment with T-N-T Trailer Sales, one of Royal's Detroit-area competitors. Fearing that confidential company information might have been compromised, Royal launched an investigation. That hunch, the investigation later revealed, proved prescient. Shortly before his resignation, Kraft forwarded from his Royal email account to his personal one quotes for two Royal customers as well as two Royal paystubs. Kraft also contacted one of Royal's customers through Royal's email server to ask the customer to send "all the new vendor info" to Kraft's personal email account. With that, Kraft then deleted and reinstalled the operating system on his company-issued laptop, rendering all of its data unrecoverable. Eventually, Royal officials went to Kraft's home and took possession of the laptop as well as Kraft's company-issued cell phone.

Before her resignation, Matthews did much the same.  From her Royal email account, Matthews sent to Kraft's personal email account a Royal "Salesperson Summary Report" that contained confidential and proprietary sales information.  She likewise forwarded an email from her Royal account to her personal one that contained customer pricing information.  And as Kraft did with his company laptop, Matthews reset her company-issued cell phone to factory settings, rendering all data on the phone unrecoverable.  Matthews then returned her company-issued laptop and cell phone to Royal's corporate headquarters and resigned, announcing her resignation more broadly through social media by sharing a link to a video of Johnny Paycheck's hit song, "You Can Take This Job and Shove It."

Unamused, Royal hired a "forensics expert" to conduct a "comprehensive and costly damage assessment" in an effort to restore the deleted data on the now former employees' devices.  R.8, Am. Compl., ¶¶ 25–26.  It later filed suit against Kraft and Matthews in federal court, alleging that their conduct violated the CFAA as well as Michigan law.

The district court, however, did not see things Royal's way.  It concluded that because Kelly and Matthews were authorized to access the information obtained from their company-issued computers and cell phones, the two did not "exceed[]" their "authorized access," as those terms are used in the CFAA, by later using the information accessed on those devices in violation of company policy.  Royal filed a timely appeal.

**ANALYSIS**

Under our familiar standard for reviewing a district court's decision granting a motion to dismiss, we "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)).  Against that backdrop, we ask whether the complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

*The CFAA claims.*  As the basis for its federal claims against Kraft and Matthews, Royal invokes § 1030(a)(2)(C) of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

That provision instructs that one who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer . . . shall be punished." *Id.* § 1030(a)(2)–(a)(2)(C). Although a violation of the CFAA can be met with criminal sanction ("shall be punished"), the Act also creates a private right of action, one that allows for civil liability where "the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." *Id.* § 1030(g); *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 299 (6th Cir. 2011) (explaining that the CFAA "criminalizes certain computer-fraud crimes and creates a civil cause of action"). Of those five subclauses, relevant here is subclause (I), which covers "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).

1. Taking all of this together, to allege a violation of § 1030(a)(2)(C), Royal must plead that: (1) Defendants intentionally accessed a computer; (2) the access was unauthorized or exceeded Defendants' authorized access; (3) through that access, Defendants thereby obtained information from a protected computer; and (4) the conduct caused loss to one or more persons during any one-year period aggregating at least $5,000 in value. At this threshold stage, Defendants do not contest the first or third elements, and we will accept, for today's purposes, that Royal's claim meets the $5,000 threshold in element four. That leaves the second element: whether Defendants' access was unauthorized, or whether Defendants exceeded their authorized access, when they sent Royal's confidential information from their work devices to their personal email accounts.

We can narrow our focus even more. Royal acknowledges that Defendants had authorization to access company information through their company email accounts, and thus does not assert that Defendants' access was without authorization. What remains for our resolution then is whether Defendants nonetheless "exceed[ed] [their] authorized access" by misusing the accessed information in violation of company policy. *Id.* § 1030(a)(2).

In answering that question, we begin with the CFAA's definitional provisions. The Act defines "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain

or alter." 18 U.S.C. § 1030(e)(6). Critical to that formulation are the terms "access," "authorization," and "obtain or alter." We have previously defined the term "authorization," at least in the inverse: "[A] defendant who accesses a computer 'without authorization,'" we have said, "does so without sanction or permission." *Pulte Homes*, 648 F.3d at 304 (citing *LVRC Holdings, LLC v. Brekka*, 581 F.3d 1127, 1132–33 (9th Cir. 2009)). "Authorization" thus means to have sanction or permission. Likewise, as to the terms "obtain" and "alter," Royal emphasizes mainly the former, which is customarily understood as "to gain" or "to attain." *Obtain*, Oxford English Dictionary Online (3d ed. 2004).

Now the term "access." It is commonly defined as some variation of "entry," generally the initial entry into something. Dictionaries include several variations of "access," one of which is "[t]he power, opportunity, permission, or right to come near or into contact with someone or something; admittance; admission." *Access*, Oxford English Dictionary Online (3d ed. 2011). Another definition describes how "access" customarily is used in a digital setting: "[t]he opportunity, means, or permission to gain entrance to or use a system, network, file, etc." A related definition describes "access" as "[t]he process or act of obtaining or retrieving data from storage." *Id.* Further reflecting how "access" is used in our technology-based society, Oxford includes a sample use of the term, defining "[h]acking" as "the practice of gaining illegal or unauthorized *access* to other people's computers." *Id.* (emphasis in original).

Reading these definitional provisions together, it follows that in utilizing the phrase "exceeds authorized access," the CFAA targets one who initially "gain[s] entrance to . . . a system, network, or file" with "sanction or permission," and then "gain[s] or attain[s]" "information" that, in the words of the statute, she is "not entitled so to obtain . . . ." 18 U.S.C. § 1030(e)(6). Congress's use of the word "so" in the phrase "so to obtain or alter" is particularly instructive. *Id.* "So" operates here as an adverb, meaning "in the way or manner described, indicated, or suggested." *So*, Oxford English Dictionary Online (2d ed. 1989). The placement of "so" near the end of the definitional sentence refers back to the antecedent "with authorization" found earlier in the definition. That textual signal is further confirmation that one who exceeds authorized access has permission to enter a computer for specific purposes, yet later obtains (or alters) information for which access has not been authorized. Section 1030(a)(2)'s aim, in other

words, is penalizing those who breach cyber barriers without permission, rather than policing those who misuse the data they are authorized to obtain.

The CFAA's "damages" and "loss" provisions further confirm the Act's narrow scope. They too appear aimed at preventing the typical consequences of hacking, rather than the misuse of corporate information in the manner alleged by Royal. "Damages" is defined with reference to the "impairment to the integrity or availability" of data, programs, systems, or information. 18 U.S.C. § 1030(e)(8). And the definition of "loss" speaks to the costs incurred by victims in responding to an offense, assessing damages, and restoring data, programs, systems, or information, as well as the costs incurred due to interrupted service. *Id.* § 1030(e)(11). While attentive to hacking episodes and the like, this is hardly the remedial scheme one might expect in a statute intended to address the misuse of sensitive business information by an employee who uses her "authorized access" in disloyal ways. *See, e.g.*, 10 U.S.C. § 923(a)(1) (punishing members of the armed forces who access a government computer "with an unauthorized purpose" and obtain classified information).

Collectively, these interpretive clues defeat Royal's CFAA claims. The CFAA prohibits accessing data one is not authorized to access. *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012). And Royal has not contested either Kraft's or Matthews's authorization to access the company files in question. Because Defendants had authorization to access that information, their conduct did not "exceed" their "authorized access," as those terms are used in § 1030(a)(2). To be sure, Royal does allege that Kraft and Matthews later misused the information they accessed. But the CFAA does not reach that conduct.

Indeed, Congress surely knew how to say "exceeds authorized use" or otherwise proscribe using data for unauthorized purposes. *See, e.g.*, 6 U.S.C. § 482(b)(1), (b)(3) (requiring sharing of homeland security information among federal agencies in a way that "ensure[s] that such information is not used for an unauthorized purpose"). Yet it did not do so in the CFAA. Congress's "silence" on that score "is controlling." *Lindley v. FDIC*, 733 F.3d 1043, 1055–56 (11th Cir. 2013) ("'[W]here Congress knows how to say something but chooses not to, its silence is controlling.'" (quoting *Griffith v. United States*, 206 F.3d 1389, 1394 (11th Cir. 2000))); *see also Averett v. United States Dep't of Health & Hum. Servs.*, 943 F.3d 313, 318 (6th Cir. 2019)

("Omitting a phrase from one statute that Congress has used in another statute with a similar purpose 'virtually commands the inference' that the two have different meanings." (citations omitted)).

We arrived at a similar conclusion as to the CFAA's scope in interpreting the phrase "without authorization" as used in § 1030(a)(5)(B) and (C) of the CFAA, statutory companions to § 1030(a)(2). *See Pulte Homes*, 648 F.3d 295. *Pulte Homes* involved allegations that a labor union launched a campaign of email spam and voicemails against a home builder in retaliation for firing a union employee. *Id.* at 303. We were asked to decide whether that conduct constituted accessing a "protected computer without authorization." *Id.* In holding that it did not, we noted that the defendant had permission to use phone and email communications to contact the plaintiff, emphasizing that the CFAA's authorization requirements focus narrowly on whether one's threshold access was authorized. *Id*. at 304.

Given this plain understanding of the CFAA's terms, we need not rely on the rule of lenity, as Defendants urge. Statutory interpretation starts (and customarily ends) with the text of the statute. Out of respect for Congress's textual choices, we turn to the rule of lenity only when, unlike here, statutory language cannot otherwise be reconciled. *See United States v. Adams*, 722 F.3d 788, 804 n.8 (6th Cir. 2013) (the rule of lenity "comes into operation at the end of the process of construing what Congress has expressed, not at the beginning" (quoting *Callanan v. United States*, 364 U.S. 587, 596 (1961))). Nor is there need to resort to legislative history, an often treacherous path in its own right. *See United States v. Woods*, 571 U.S. 31, 46 n.5 (2013) ("Whether or not legislative history is ever relevant, it need not be consulted when, as here, the statutory text is unambiguous."); *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("[Legislative history] is not merely a waste of research time and ink; it is a false and disruptive lesson in the law. . . . The greatest defect of legislative history is its illegitimacy."). *But see United States v. Valle*, 807 F.3d 508, 525 (2d Cir. 2015) (utilizing legislative history to conclude that the CFAA was intended to address hacking, as that history consistently references "trespass" into computer systems or data as the problem the Act was meant to remedy).

2. Our interpretation today, we acknowledge, might not be the final word. The Supreme Court recently granted certiorari in *Van Buren v. United States*, 940 F.3d 1192 (11th Cir. 2019),

*cert. granted*, 206 L. Ed. 2d 822 (Apr. 20, 2020) (No. 19-783). Although set in a criminal posture, *Van Buren* presents the Supreme Court with the opportunity to resolve the meaning of "exceeds authorized access" as used in the CFAA.

That the Supreme Court agreed to hear *Van Buren* is likely a reflection of the lower courts' dueling interpretations of this critical passage in the CFAA. 18 U.S.C. § 1030(a)(2). As we do today, the Second, Fourth, and Ninth Circuits have also held that one who is authorized to access a computer does not exceed her authorized access by violating an employer's restrictions on the *use* of information once it is validly accessed. *See Valle*, 807 F.3d at 511–12; *WEC Carolina Energy Sols., LLC v. Miller*, 687 F.3d 199, 206 (4th Cir. 2012); *LVRC Holdings*, 581 F.3d at 1129, 1133. So too have a majority of district courts in our Circuit. *See Royal Truck & Trailer Sales & Serv., Inc. v. Kraft,* No. 18-10986, 2019 WL 1112387, at *3 (E.D. Mich. Mar. 11, 2019) (collecting cases).

That said, today's decision is in tension with those from the First, Fifth, Seventh, Eighth, and Eleventh Circuits, all of whom have more broadly interpreted "exceeds authorized access." Those courts read § 1030's statutory terms as encompassing situations where an employee has authorization to access company information but uses that information in violation of company policy. *See United States v. Rodriguez*, 628 F.3d 1258, 1263–64 (11th Cir. 2010) (holding that an employee exceeded authorized access by obtaining company information for non-business purposes); *Int'l Airport Ctrs., LLC. v. Citrin*, 440 F.3d 418, 420 (7th Cir. 2006) (utilizing principles of agency law to find that an employee accessed his computer "without authorization" where his authorized access was terminated once he used the information improperly); *United States v. John*, 597 F.3d 263, 271–72 (5th Cir. 2010) (finding an employee liable for exceeding authorized access even where he had access for other purposes); *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 581–83 (1st Cir. 2001) (holding that a former employee exceeded authorized access by violating a confidentiality agreement and accessing his former employer's website).

In addition to being less faithful to § 1030's text, this latter interpretation has the odd effect of allowing employers, rather than Congress, to define the scope of criminal liability by operation of their employee computer-use policies. Had Congress intended the seemingly

sweeping result of effectively criminalizing violations of an employee handbook, it would have said so in clear terms. *See Jones v. United States*, 529 U.S. 848, 858 (2000) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed . . . the prosecution of crimes." (internal quotation marks omitted)). Yet the CFAA does not mention such policies. Absent clear instruction, we should be hesitant to impose federal sanctions for conduct as pedestrian as checking one's private social media account on a work phone. With corporate policies sometimes written in broad and arguably vague terms, treating violations as criminal acts also risks a lack of statutory notice to employees over the precise nature of conduct now criminalized. *See*, *e.g.*, *United States v. Lopez*, 929 F.3d 783, 785 (6th Cir. 2019) (penal statutes must define the criminal offense with "sufficient definiteness that ordinary people can understand what conduct is prohibited" (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983))). And it risks "arbitrary and discriminatory enforcement" given the variation in those policies between companies and across industries. *Nosal*, 676 F.3d at 860; *United States v. Dunning*, 857 F.3d 342, 348 (6th Cir. 2017). All of this counsels in favor of our narrow reading of the CFAA.

*Data deletion.* One additional issue of federal law deserves mention. Royal also alleges that Kraft and Matthews deleted data from their work devices. And unlike the Royal customer information Kraft and Matthews were authorized to access for some purposes, Royal contends that Kraft and Matthews had no authorization to engage in data deletion.

As compared to misusing confidential information one is at least authorized to obtain, data deletion, in some circumstances, might fairly be characterized as more akin to "exceed[ing] one's] authorized access." But even if Kraft and Matthews "excee[ded their] authorized access" by deleting data from their company devices, Royal's complaint does not allege that the two "thereby obtain[ed] information from [a] protected computer," a required element under § 1030(a)(2)(C). After all, as others before us have previously acknowledged, it is difficult to equate deleting data with obtaining the same. *See Experian Mktg. Sols., Inc. v. Lehman*, 2015 WL 5714541, at *7 (W.D. Mich. Sept. 29, 2015) (accessing a laptop to delete data was not obtaining information for purposes of § 1030(a)(2)(C)); *Bd. of Trustees of Pierce Twp. v. Hartman*, 2008 WL 11351291, at *4 (S.D. Ohio June 18, 2008) (deletion of data on a work

device after employment had ended did not constitute "obtain[ing] information" under § 1030(a)(2)(C); "[r]ather, the claim is that [defendant] destroyed information without authorization"). In the context of the claim presented here, we thus reject this theory of CFAA liability as well.

*State-law claims.* In the absence of a viable federal claim by Royal, the district court dismissed Royal's state-law claims without prejudice. It did so in accordance with the settled rule that when a district court dismisses all claims over which it has original jurisdiction (here the CFAA claims), it may also dismiss any state-law claims before it based on supplemental jurisdiction. 28 U.S.C. § 1367(c)(3); *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) (noting that "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed" (citation omitted)). We see no reason to do otherwise.

## CONCLUSION

For the aforementioned reasons, we **AFFIRM** the judgment of the district court.