[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13547

_____

D.C. Docket No. 3:16-cr-00003-TCB-RGV-15


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHELSEY MAYWEATHER,
JEREMY FLUELLEN,
CHRISTOPHER WILLIAMS,
TRAMAINE TUCKER,

Defendants-Appellants.


_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(March 17, 2021)

Before BRANCH, TJOFLAT, and ED CARNES, Circuit Judges.

BRANCH, Circuit Judge:

Chelsey Mayweather, Jeremy Fluellen, Christopher Williams, and Tramaine Tucker (collectively "defendants") appeal their convictions for Hobbs Act extortion and attempted distribution of cocaine and methamphetamine. They argue on appeal that the trial court (1) erroneously refused to allow them to discuss entrapment during closing arguments and to give their requested entrapment instructions and (2) improperly gave no instructions at all on the meaning of "official act" for the Hobbs Act extortion counts. After careful review and with the benefit of oral argument, we conclude that Williams and Fluellen were entitled to an entrapment defense jury instruction, the omission of which was reversible error. Accordingly, we reverse Williams's and Fluellen's convictions and remand the case for a new trial as to the two of them. On the other hand, we conclude that Tucker and Mayweather were not entitled to an entrapment instruction, and we affirm their respective attempted drug distribution convictions. Finally, we conclude that it was reversible error not to provide the jury with any definition of "official act" for purposes of the Hobbs Act extortion counts. As a result, we reverse the Hobbs Act extortion convictions as to all four defendants and remand for a new trial as to those counts.

## I.    Background

The FBI conducted a large-scale sting operation in response to a concern of the Georgia Department of Corrections ("GDC") that there was corruption in the

prison system.  Specifically, GDC suspected that corrections officers were accepting bribes to smuggle contraband into prison.  The FBI investigation started in May 2014 and ultimately resulted in the indictments of approximately 130 people.  During the investigation, the FBI arranged for an undercover informant, Aakeem Woodard, to set up fake drug deals with uniformed correction officers outside of the prison walls.[1]  The FBI instructed Woodard to tell the correction officers to wear their GDC uniforms as they transported the drugs with the expectation that police officers would not stop the cars or detain them as a professional courtesy.  Woodard's 18-month stint in the operation resulted in a seventy-five count indictment against twenty-five defendants.

The four defendants in this case, all corrections officers caught in the sting operation, were tried together on several of those counts.[2]  Before trial, Williams and Fluellen moved to have the Hobbs Act extortion charges dismissed, arguing that wearing a GDC uniform did not constitute an "official act" as the statute required.  The district court denied that motion.  Additionally, prior to trial, the

---

[1]  The FBI reasoned that this alternative was less dangerous than smuggling contraband, real or fake, into the prison.

[2]  Specifically, Fluellen, Tucker, and Mayweather were charged with two counts of attempting to distribute a controlled substance in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C), and two counts of Hobbs Act extortion in violation of 18 U.S.C. § 1951(a). Williams initially was charged with nine counts of each crime; before trial, however, the government dismissed all Hobbs Act charges against him for conduct that occurred after he was no longer employed as a prison official, resulting in a total of three counts of Hobbs Act extortion.

3

government filed a motion *in limine* seeking, as relevant to this appeal, to preclude the defendants from raising an entrapment defense.  After hearing argument from the parties, the district court denied the government's motion, noting that it was a "close . . . question" but that it was not going to bar the defense.  The government stated that it accepted the ruling, but that it intended to renew its motion at the close of its case.

Thereafter, the six-day trial consisted of many federal agents testifying to various video- or audio-recorded transactions involving the defendants.  Each defendant participated in multiple car rides during which they believed they were transporting drugs while wearing their official prison guard uniforms.  These accounts were not disputed.  Instead, the defendants sought to advance an entrapment defense, which they referenced in opening statements and cross examinations during the government's case-in-chief.  At the close of the government's case, the government renewed its argument that the defense of entrapment was not available because this Circuit does not recognize derivative entrapment and no government agent recruited any of the defendants (instead they were recruited by other co-defendants).  In response, each defendant argued that he or she had met the threshold burden of presenting evidence sufficient to raise a jury issue as to whether the government's conduct induced the defendant into engaging in the charged conduct.  The district court sustained the government's motion *in*

*limine* as to all four defendants concluding that this case was simply not "an entrapment case." Prior to closing arguments, the defendants renewed their requests for a jury instruction on the defense of entrapment, which was denied without further discussion. Following the jury charge, the defendants renewed their objections to the district court's denial of their request for an entrapment instruction.

With regard to the Hobbs Act extortion counts, the defendants made Rule 29 motions for a judgment of acquittal,[3] arguing that the act of wearing a uniform cannot be an "official act" as a matter of law, and that the court should give the pattern Hobbs Act extortion jury instruction promulgated by this Court following the Supreme Court's decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016).[4] Tracking the definition of "official act" from the *McDonnell* decision, the pattern charge expressly defined the "official act" a defendant must take, one of the requisite components to prove the extortion element of a Hobbs Act extortion violation. *See* Eleventh Circuit Pattern Jury Instructions, O70.2 (2019). The

---

[3] "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29.

[4] *McDonnell*, which dealt with a governor's conviction for Hobbs Act extortion, held that the definition of "official act" was more "bounded" than the government contended and did not include simply arranging meetings or introducing people to one another. *See McDonnell*, 136 S. Ct. at 2368. *McDonnell*'s holding and the resulting pattern charge will be analyzed in more depth later in this opinion.

government responded that defendants' "decision to wear their uniforms . . . to exert pressure over another official, that is, another police officer who might want to stop them and search them," qualified as an official act and argued that the pattern instruction did not fit the facts of this case because *McDonnell* involved different officials exercising different governmental powers.  As a result, the government maintained that the pre-*McDonnell* Hobbs Act extortion jury charge was the appropriate instruction.  Alternatively, the government argued that the district court could give the post-*McDonnell* pattern jury charge but should tailor it to the specific facts of this case by excising the portions of the definition that were simply not applicable.  The district court denied the Rule 29 motions and declined to use the post-*McDonnell* pattern charge because the official act definition it contained "d[id] not apply to every Hobbs Act extortion case."  The district court noted that this case was "decidedly different from *McDonnell,* and that [the] pattern charge is obviously based on *McDonnell* . . . [and does not] fit[] the facts of this case."  Instead, the district court gave the pre-*McDonnell* charge, which did not define "official act."  Defendants objected to this charge.

After the jury retired to deliberate, the court received a note from one of the jurors stating that "I really don't agree with how this operation was done" and "[a]s a juror I understand I have the right to vote 'not guilty' based solely on that belief." The district court then gave supplemental instructions to the jury, over the

defendants' objections, that included the following: "The manner in which the government conducted this investigation is not an issue for your consideration because entrapment is not a defense in this case." Subsequently, the jury returned a verdict finding all defendants guilty of all charges.

We consider two arguments on appeal. First, whether the district court erred in denying the defendants the right to present an entrapment defense and have the jury instructed on the same; second, whether the district court erred in failing to give the post-*McDonnell* pattern charge or in failing to instruct the jury on the meaning of "official act" for purposes of the Hobbs Act extortion counts in the charge it ultimately provided. Because the factual bases for the entrapment issue are different for each defendant, we lay out the facts elicited at trial about how each defendant became involved in the sting operation below.

A.    Jeremy Fluellen

Fluellen worked as a corrections officer at Hancock State Prison for several years before the FBI investigation. Fluellen came to the attention of the FBI investigators through Crystal Brooks,[5] another corrections officer, who informed Woodard that Fluellen was someone she had worked with in the past to smuggle

---

[5] Brooks was charged under the same indictment as the co-defendants in this case but was not tried with them.

contraband into the prison.[6]  Brooks gave Fluellen's number to Woodard and encouraged Fluellen to get in contact with Woodard.  Fluellen considered contacting Woodard, but ultimately did not.

Woodard eventually called Fluellen on August 21, 2014.  During the phone call, Woodard did not mention drugs but asked if Fluellen was ready to "get to it." After a pause, Fluellen responded affirmatively.  When Woodard asked when Fluellen was available to help him, Fluellen replied that he was not available on a particular day because the GDC's tactical team, of which he was a member, was visiting another prison.  Woodard told Fluellen that he was going to "take care of some things" for Fluellen "just for letting [Woodard] know about that."

Woodard called Fluellen again on the next day.  In this call, Woodard laid out for the first time what he wanted from Fluellen: "The main thing is . . . I heard you was trying to sneak cigarettes and stuff into the prison . . . that stuff's petty. The main thing is out here on the streets . . . I need a team out here."[7]  Fluellen asked, "What are you saying, man?"  Woodard answered that he did "transport" and needed a team to make sure the "transport" made it to its destination.

---

[6]  Fluellen himself testified that he had not actually smuggled anything; he claimed he only told Brooks he had smuggled things because she was encouraging him to say things that would make him a more attractive candidate for Woodard.

[7]  While these phone calls were not transcribed, the audio recordings are part of the record.  At trial, Woodard testified that during this call he was arguing to Fluellen that sneaking contraband into the jails did not make sense—it was too risky and did not pay enough.

Woodard explained that if someone rode along inside the car with a uniform on, the police were not going to pull them over. He stated that he would drive and just needed someone to ride along with him. Woodard noted that "the money gonna be great though." Woodard asked Fluellen about his availability in the upcoming weeks to "chop it up," which was explained at trial to mean "talk," and Fluellen told Woodard about an upcoming court date Fluellen had for a DUI ticket. Woodard asked if Fluellen was going to be able to "beat" the charge, and Fluellen responded that it depended on whether he could come up with the money for the fine. Woodard assured Fluellen that they could arrange something before the fine was due. Woodard later reiterated that Fluellen should "not worry about them bills" and that "we can take care of them, so long as you do the work." Fluellen responded "Ok." Woodard spent the rest of the phone call reminding Fluellen how easy the trip would be, how the police officers would not stop the car with Fluellen in it, and how Woodard needed a team. At the end, Woodard reiterated "we gonna take care of all your little fines and stuff, man."

Woodard called again a few days later. He asked if Fluellen would be available to meet on a Wednesday morning. Woodard repeatedly emphasized how short and easy this meeting would be and stated "I just want to chop it up with you, really. But while we doing that I gotta drop off a package." He also renewed his guarantees that the cops would not pull them over at least five times. Woodard

concluded the call by saying they were mostly just going to "chop it up," that it would be a "short little trip," and that Woodard just wanted to "do something" for Fluellen. During the next few phone conversations, Woodard discussed logistics for their meeting and teased Fluellen about the money Fluellen was making doing "little things" like sneaking contraband into prison. All told, Woodard called Fluellen five times and had a total of nine phone conversations with Fluellen before the first transport.

On August 27, 2014, Fluellen arrived at the designated meeting point in his GDC uniform and got into Woodard's car. Woodard asked him to check the bag already in Woodard's car that held the fake drugs and explained that there were three "keys," or kilograms, of drugs. Woodard told Fluellen that they would be doing "bigger shipments down the line," and that if he wanted to leave, he was free to do so. Fluellen declined to leave. Woodard then told Fluellen that he had "something big" coming up and that he (Woodard) needed a team. Woodard again reiterated that working with him was better than smuggling things into prison. Fluellen then participated in the fake drug transaction.

10

After the initial transaction on August 27, Fluellen attended a meeting hosted by Woodard at a Cheddars restaurant on September 9, 2014. The details of this meeting are explored in depth below.[8]

B.    Christopher Williams

Williams worked in the same unit as Fluellen at Hancock State Prison.[9] Williams's first contact with the FBI investigation was on September 9, 2014, at the Cheddars meeting hosted by Woodard.[10] Woodard, Brooks, Fluellen, Williams, and two other invitees to the scheme attended the meeting. Woodard began the meeting by making a few generous gestures: he told the corrections officers they could "order what [they] want" and that they were not "shopping . . . on a budget"; he ordered two "top shelf" margaritas for himself and Brooks; he gave them gas money for driving down to the meeting; and he had conversations with some of the officers about how he would "teach [them] the game, how to make money and keep it." Woodard also promised various corrections officers

---

[8] After the Cheddars meeting, Fluellen completed an additional transaction with Woodard on September 18, 2014.

[9] In December 2015, Williams left his job at the state prison, though he continued to participate in the drug transport scheme.

[10] The record is not entirely clear as to what Williams was told before the meeting or by whom. Woodard directed Fluellen to bring three or four other officers with him to the Cheddars' meeting, but the record does not indicate whom he approached or what he said. Williams did say in a post-arrest interview that Brooks "got him involved" with the drug operation, and "introduced" him to Woodard, but did not elaborate.

that he would "look out" for them.  Woodard then gave what can only be described

as his sales pitch to join his team:

> Ok, listen, before we get started eating and everything, I just want to
> put this on the table. . . . I traffic, point blank.  That's what I do.  I
> move stuff back and forth.  All I'm trying to do is put together me a
> team. . . . We ain't doing no gun play.  We ain't doing no meeting in
> no dark alleys.  All we're doing is picking up, drive it, drop it off.
> That's it.  I needed somebody because I realized if you're sitting in the
> car with somebody with a uniform on, if they do get pulled over,
> speeding, they ain't gonna say let me search the car.  Ain't gonna be
> no ticket . . . Ain't gonna be no shootouts, no crazy junk.
>
> Anytime I say something, ask questions.  Anything [is] cool, don't be
> like I can't say nothing to him.  Say it, man.  I want everybody to be
> clear what's going on, what I'm proposing.  It's a good way to make a
> whole lot of money and I ain't talking about no two or three hundred
> dollars.  Every time you do something, it's gonna mean a thousand.  It
> ain't gonna be no every—every three or four days either.  Maybe
> once, maybe twice a week, that's it.  Maybe twice a month, that's it.
> In and out. . . . I done my time.  I did twenty-five to the door. . . . So
> you can ask anybody on the inside, they going inside, you know
> Aakeem, they're gonna say oh, yeah. . . . They'll tell you I ain't never
> told you all no lie or nothing.  Shot you all no bull or nothing.  If I told
> you I was gonna do something, I did it . . . . I always pay people up
> front.  I've never said do a job and I'll pay you when you get through.
> I ain't gonna never—I don't work like that.  Because if my team's
> cool, I'm straight.  You all can get up from this table and say I don't
> want nothing to do with that and be gone, man.  Holler at you, bro.
> I'm cool, man.  I don't want to see your faces again.  But if you're in,
> you're in.  I ain't talking about no Mafia in, you're in and you can't
> get out. . . . But the people I work for, they're serious. . . . I'm
> bringing you all in up under me, so if something goes wrong, it's my
> head on the chopping block, bro.  I ain't gonna let my head be on the
> chopping block. . . . I ain't talking about moving no twenty or thirty
> either.  But I can get more if I have a bigger team.  And can move up
> the ladder . . . But I don't plan on getting pulled over.  I don't plan on
> speeding.  I don't plan on looking crazy.  I don't plan on swerving.

12

Don't plan on doing nothing.  Just pick up and go back.  I don't have no chance of getting pulled over.

Woodard then answered a few questions from one of the officers before polling everyone to see who was interested.[11]  Woodard then makes a promise:

> Loyalty is the main thing.  If you call me and say hey, I'm—look, man, I got a little trouble with this and that, then you call me and that's it.  I got a little trouble on a ticket, I need to pay this.  I'll pay it.  If you call . . . I'll tell you to go by Western Union and I'll send it to you.  After two runs, you should have enough money that you shouldn't have to ask me for that much . . . From this day forward, you're straight.  You don't have to put yourself in no awkward position whatsoever . . . if you need something, just call me.

After Woodard told the group that bringing contraband into the prison was "really petty money" next to what they could be doing, he asked for Williams's number.  Williams gave it to him.

Williams first participated in a fake drug transport on September 18, 2014.  Over the next year, he participated in eight additional transactions.  He was also partially responsible for recruiting Tucker and Mayweather.

C.    Tramaine Tucker

Tucker was a corrections officer at the Riverbend Correctional Facility, a privately-owned prison.[12]  Woodard initially called Tucker one time in early to

---

[11]  Williams's reply is not clear on the transcript or the audio.

[12]  Tucker lived in the same neighborhood as Williams and learned about the scheme from him.  Williams gave Woodard Tucker's phone number and identified Tucker as a potential team member.

mid-April, but could not reach Tucker.  Woodard called Tucker again on April 15, 2015, and they arranged a date to meet in person, but did not discuss any other details about the proposed drug transport.

Tucker's first fake drug transportation occurred on April 22, 2015, just a few days after his phone call with Woodard.  Tucker arrived, wearing his uniform, with two other individuals (one of which was Williams who was also in uniform), and Woodard showed Tucker the drugs and explained what his job was going to be.  Woodard then gave Tucker a warning regarding consequences of bungling the drug transport:

> [I]t's gonna be on your head and my head then . . . I ain't gonna let it go on my head. I gotta find you.  That's just real talk . . . people I work for, they crazy, man.  But they cool . . . you show love to them, they show love back.

Woodard explained that "I just need you to ride for protection, man.  Show your badge.  If they pull us over or anything, just—I'm gonna say I'm taking you all to, um, -- what, training or something."  Woodard then offered Tucker a chance to back out of the deal, and Tucker stated "oh, no, you're good."

Tucker also completed a drug transport on May 14 of the same year.  On May 30, he spoke with Woodard on the phone about a possible female recruit, who turned out to be Mayweather.

D.    Chelsey Mayweather

14

Mayweather worked as a corrections officer at Baldwin State Prison. Williams, who was her cousin, initially told her about the scheme on May 26, 2015. On June 4, 2014, after Williams gave Woodard's phone number to Mayweather, she called Woodard to find out about the job. Woodard told Mayweather specifically that they would be moving cocaine and methamphetamine and told her to wear her uniform. Woodard also told Mayweather how much she would be paid for her work.

On June 17, 2015, Mayweather, wearing her corrections officer uniform, met Woodard in-person for a transport run. When she arrived for that transaction, Woodard spoke to her alone in the car, saying "I don't want nobody being forced" to do the job. Mayweather replied: "I feel you," and shortly thereafter, expressly stated "Nobody's forcing me." Woodard then told her what to expect: "This is it. It's simple. I don't know if he told you what's going on. All you're doing is transferring these." Woodard paid her money, and Mayweather said "we straight for now" before riding along on the drug transport with Williams. She testified that she was scared when she completed the ride and never looked inside the backpack containing the fake drugs or touched it. She completed a second transaction on July 21, 2015. On this occasion, Mayweather drove and handled the bag herself.

## II.    Standard of Review

15

"We conduct a *de novo* review of the legal correctness of a jury instruction, but we review for abuse of discretion questions concerning the phrasing of an instruction . . . [or] a district court's refusal to give a requested jury instruction."[13] *United States v. Van Buren*, 940 F.3d 1192, 1199–1200 (11th Cir. 2019). A district court's refusal to deliver a jury instruction requested by a defendant "constitutes reversible error only if the instruction '(1) is correct, (2) is not substantially covered by other instructions which were delivered, and (3) deals with some point so "vital" that the failure to give the requested instruction seriously impaired the defendant's ability to defend.'" *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995) (quoting *United States v. Opdahl*, 930 F.2d 1530, 1533 (11th Cir. 1991)). "An erroneous jury charge only entitles the defendant to reversal of his conviction and remand for a new trial on the count in question when a reasonable likelihood exists that 'the jury applied the instruction in an improper manner.'" *United States v. Chirinos*, 112 F.3d 1089, 1096 (11th Cir. 1997) (quoting *United States v. Chandler*, 996 F.2d 1073, 1085 (11th Cir. 1993)).

---

[13] Despite the "the inconsistency in our precedents" regarding the standard of review for failure to give an entrapment instruction, we have clarified that the proper standard is *de novo*. *United States v. Dixon*, 901 F.3d 1322, 1346–47 (11th Cir. 2018), *cert. denied sub nom. Portela v. United States*, 139 S. Ct. 854 (2019), and *cert. denied sub nom. Chacon v. United States*, 139 S. Ct. 1392 (2019). "Whether a defendant is entitled to an entrapment instruction depends on whether there is *sufficient evidence* from which a reasonable jury could find entrapment, and the sufficiency of the evidence is a legal question that we review *de novo*." *Id.* at 1347 (internal citations omitted).

A jury instruction "must . . . enable the jury to apply the law to the facts." *United States v. Silverman*, 745 F.2d 1386, 1395–96 (11th Cir. 1984); *see United States v. Isnadin*, 742 F.3d 1278, 1296 ("[T]he charge as a whole [must] accurately reflect[] the law in the context of a case's facts."). Thus, a district court "has wide latitude in determining the exact formulation of the jury instruction," *United States v. Gaines*, 690 F.2d 849, 856 (11th Cir. 1982), and may "refuse a requested instruction that is incomplete, erroneous, or misleading," *Silverman*, 745 F.2d at 1396; *see United States v. Rodriguez-Suarez*, 856 F.2d 135, 140 (11th Cir. 1988) ("[T]he judge may refuse confusing or cumulative instructions.").

## III.    Discussion

On appeal, the defendants argue that their convictions should be reversed because: (a) they were entitled to receive an entrapment instruction and argue entrapment to the jury as to all charges, and (b) the district court should have instructed the jury with the pattern jury instruction or provided a definition of "official act" for the Hobbs Act extortion charges. We deal with each argument in turn.

### A.    Entrapment Defense and Jury Instructions

"Entrapment is the government's inducement of the commission of a crime by one not predisposed to commit it." *United States v. Humphrey*, 670 F.2d 153, 155 (11th Cir. 1982). "The conduct with which the defense of entrapment is

17

concerned is the manufacturing of crime by law enforcement officials and their

agents." *Goss v. United States*, 376 F.2d 812, 813 (5th Cir. 1967). In other words,

> [e]ntrapment occurs only when criminal conduct is the product of the
> creative activity of government officials. The criminal design must
> originate with a government official or one acting at his direction in
> implanting in an innocent person's mind the disposition to commit the
> crime. The defense of entrapment rests on the theory that a defendant
> is not culpable where government officials instigated his conduct.
> There is no entrapment, however, if the accused is ready and willing
> to commit the crime whenever the opportunity might be afforded—
> even if by government agents or informers acting under their
> supervision.

*United States v. Groessel*, 440 F.2d 602, 605 (5th Cir. 1971) (internal citations and

footnote omitted). Thus, entrapment is an affirmative defense that consists of "two

related elements: government inducement of the crime, and a lack of predisposition

on the part of the defendant to engage in the criminal conduct." *Mathews v. United

States*, 485 U.S. 58, 63 (1988); *see also Isnadin*, 742 F.3d at 1297.

The two components of entrapment are evaluated in two distinct stages by

two different decision-makers. First, the trial court must determine if the

defendant has met his initial burden of producing sufficient evidence of

government inducement. *See United States v. Sistrunk*, 622 F.3d 1328, 1332–33

(11th Cir. 2010) (explaining that "in laying an evidentiary foundation for

entrapment, the defendant bears the initial burden of production as to government

inducement," and "the sufficiency of the defendant's evidence of government

inducement is a legal issue to be decided by the trial court." (alteration adopted)

18

(quotations omitted)). If the defendant meets this initial burden, "[he] is entitled to have his defensive theory of the case put before the jury with appropriate instructions from the trial judge." *United States v. Ryan*, 289 F.3d 1339, 1344 (11th Cir. 2002) (quoting *United States v. Timberlake*, 559 F.2d 1375, 1379 (5th Cir. 1977)). Once before the jury, the burden shifts to the government to prove the defendant's predisposition to commit the crime beyond a reasonable doubt. *United States v. Orisnord*, 483 F.3d 1169, 1178 (11th Cir. 2007). Keeping these two steps separated is important, because ultimately, "[t]he question of entrapment is generally one for the jury, rather than for the court." *Mathews*, 485 U.S. at 63; *see also Humphrey*, 670 F.2d at 155 ("If there is any evidence in the record that, if believed by the jury, would show that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it, then, as in all other cases, involving questions of guilt or innocence, the jury must be permitted to resolve the matter." (quoting *Pierce v. United States*, 414 F.2d 162, 168 (5th Cir. 1969))). Because a "defendant in a criminal case is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence," *Ryan*, 289 F.3d at 1344 (quotation omitted), the "failure to give an instruction when the defendant has met his burden is reversible error," *United States v. Bagnell*, 679 F.2d 826, 835 (11th Cir. 1982).

19

Thus, to determine whether a defendant has produced enough evidence to merit an entrapment defense and a jury instruction, we look only at whether there was sufficient evidence produced to raise the issue of government inducement. And "[i]n determining whether [a defendant] met his initial burden of production, we must accept the testimony most favorable to him." *Humphrey*, 670 F.2d at 156. Importantly, the initial burden of production to show inducement is not onerous. *See United States v. Brown*, 43 F.3d 618, 623 (11th Cir. 1995) ("This burden is light because a defendant is generally entitled to put a recognized defense to the jury where sufficient evidence exists for a reasonable jury to find in [his] favor."). Rather, the defendant must merely come forward "with some evidence, more than a scintilla, that government agents induced him to commit the offense." *Timberlake*, 559 F.2d at 1379; *see also Brown*, 43 F.3d at 623 ("A defendant may show government inducement by producing any evidence sufficient to raise a jury issue 'that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it.'" (quoting *United States v. Andrews*, 765 F.2d 1491, 1499 (11th Cir. 1985))).

Nevertheless, a defendant cannot show inducement merely by showing that the government provided an "attractive" opportunity to commit a crime. *Sistrunk*, 622 at 1334; *Brown*, 43 F.3d at 623 ("[E]vidence of the government's mere suggestion of a crime or initiation of contact is not enough."). Inducement

20

involves more than a government-created criminal opportunity; it "requires an element of persuasion or mild coercion. . . . [I]nducement consists of opportunity plus something like excessive pressure or manipulation of a non-criminal motive." *Brown*, 43 F.3d at 623; *accord Sistrunk*, 622 F.3d at 1333. We have given some examples of inducement:

> Evidence of "persuasion or mild coercion" may be shown by evidence that the defendant "had not favorably received the government plan, and the government had to 'push it' on him, or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate."

*Sistrunk*, 622 F.3d at 1333 (quoting *Ryan*, 289 F.3d at 1344).[14] In other words, an opportunity *plus* some added government behavior that aims to pressure, manipulate, or coerce the defendant into criminal activity is government inducement.[15]

---

[14] These examples are *only* examples, not an exhaustive list of ways a defendant can show inducement. *See Orisnord*, 483 F.3d at 1178 (inducement may be shown by "any evidence" that raises a "jury issue that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it.").

[15] The district court seems to have used an erroneous heightened standard to evaluate the burden of production on the defendants to show government inducement. For instance, when ruling as to whether some of the defendants had met their burdens of production, the district court remarked: "I would think that the type of evidence required to satisfy that criterion would be something along the lines of it shocks the conscience," and "I have just the impression from reading the cases that you are going to have to be—have some extremely compelling evidence to survive the entrapment defense limitations circumscribed by the Eleventh Circuit." While the question of whether a defendant was entrapped as a matter of law requires "patently clear" or "obvious" evidence, as we emphasize throughout this opinion, the burden of production necessary to present an entrapment defense theory to the jury is light. *See, e.g.*, *Groessel*, 440 F.2d at 606 (distinguishing between sufficient evidence for a jury instruction on entrapment and evidence establishing entrapment as a matter of law, which must be "patently clear" or "obvious" that the defendant was entrapped).

21

With this burden of production in mind, we evaluate whether the defendants met their respective burdens of production as to government inducement.

### 1.    Fluellen Met the Burden of Production as to Inducement

Woodard initiated contact with Fluellen after Fluellen had an opportunity to call Woodard but did not.  Woodard began his interactions with Fluellen by making an unsolicited offer to "take care of some things" for Fluellen simply because Fluellen informed him that he was unavailable to meet on a given day because the GDC's tactical team would be visiting another prison.  Woodard told Fluellen that what Fluellen was already doing—sneaking contraband into the prison—was petty compared to what he could do on Woodard's team.  Woodard also specifically referenced the financial trouble that Fluellen was in—his DUI ticket—and promised multiple times to help cover those fines as well as other personal debts.  Woodard spent a large portion of his conversations with Fluellen minimizing the risk of being caught by framing it as just a short ride to talk with almost no chance of being pulled over by a police officer.[16]  And, finally, we note the number of conversations Woodard had with Fluellen (nine), which, coupled

---

[16] We reiterate that merely offering an opportunity to commit a crime is not inducement.  *See Brown*, 43 F.3d at 623.  But here, Woodard cites the ease of his proposed transaction several times *in response to* Fluellen's hesitation.  It is not the ease of the crime that constitutes inducement, but Woodard's relentless pursuit of Fluellen's participation and manipulation of his hesitation.  Woodard's actions are sufficient to raise the question of whether he pressured Fluellen to participate, which is sufficient to meet his burden of production as to government inducement.  *See id.*

with Fluellen's hesitation during the first few calls, points towards inducement. Thus, Woodard's pressure tactics raise a question as to whether there was a substantial risk that those efforts may have convinced Fluellen to do something that he may not have intended to do beforehand.  Accordingly, Fluellen met his light burden of production as to government inducement and he should have had the ability to present his entrapment defense to the jury and receive an instruction on this defense.  *See Orisnord*, 483 F.3d at 1178 (inducement may be shown by "any evidence" that raises a "jury issue that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it"); *see also Brown*, 43 F.3d at 623; *Bagnell*, 679 at 835.

2.    *Williams Met the Burden of Production as to Inducement*

Williams was not on the FBI's radar until he arrived at the meeting with Woodard, an undercover informant and the government's agent,[17] at Cheddars. Woodard began the meeting by making a few generous offers at lunch—he gave the defendants money for gas and assured them they could order any food or drink they wanted on his dime—which in and of itself would not be sufficient to raise a question of inducement.  Woodard, however, clearly moved into efforts to pressure Williams into the crime and "push it" on him.  He stated: "I'm gonna look out for

---

[17] The government does not contest that Woodard, who was in the employ of the FBI, was a government agent.

23

you," "[f]rom this day forward, you're straight," and "If you call me and say hey, I'm—look, man, I got a little trouble with this and that, then you call me and that's it. [You] got a little trouble on a ticket . . . I'll pay it," for example. This language meets Williams's light burden of presenting "any evidence" to raise the issue of government inducement. Specifically, Woodard's promises to help Williams when he is in trouble or to take care of any of financial concerns presents the possibility that he "manipulated" Williams by appealing to "non-criminal motives." *Sistrunk*, 622 F.3d at 1333.

Further, Woodard tried to convince Williams that the task would not be dangerous—"no gun play… no meeting in dark alleys." According to Woodard, the job was just "picking up, drive it, drop it off. That's it." Merely describing a criminal job, of course, is not inducement—but offering a job, explaining how easy the job is, and attempting to persuade the listeners that a federal crime is the same as simply riding along in a car is not "merely providing an opportunity." And Woodard's persuasion did not stop with the description of the crime—Woodard attempted to persuade Williams by comparing his proposal to what the defendants were supposedly being investigated for—sneaking contraband into prison—to show Williams that *his* proposed crime was more lucrative and easier. Woodard's pressure tactics raise a question as to whether there was a substantial risk that those efforts may have convinced Williams to do something that he may not have

24

intended to do beforehand.  Accordingly, Williams met his light burden of showing government inducement.  *See Orisnord*, 483 F.3d at 1178.  Therefore, Williams should have had the ability to present his entrapment defense to the jury and receive an instruction on this defense.[18]  *Brown*, 43 F.3d at 623; *Bagnell*, 679 at 835.

### 3.    *Tucker Did Not Meet the Burden of Production as to Inducement*

Tucker showed up in his uniform ready for the transport.  Woodard showed him the drugs and explained how the job worked.  Although Woodard delivered a warning during the first drug transport that might be construed as threatening Tucker, he also gave Tucker the opportunity to back out, and Tucker declined to do so.  There is no evidence that Woodard put any pressure on Tucker to participate or manipulated him by appealing to non-criminal motives.  In other words, there was simply no "plus" that the government presented to Tucker beyond the "opportunity" to commit a crime.  Accordingly, Tucker did not meet his burden of production to merit an entrapment instruction.

---

[18]  The government argues that the entrapment instruction, on remand, would only apply to the first drug deal each defendant participated in.  However, this argument runs counter to our binding precedent in *Wells*, which, like here, dealt with a series of drug transactions at the bequest of the government, and affirmed a jury instruction that the jury should consider entrapment as to each count separately.  *United States v. Wells*, 506 F.2d 924, 926 (5th Cir. 1975).  We recently reaffirmed this principle in *Isnadin*, where we noted that a defendant can show that a "course of conduct" was induced by government action.  *Isnadin*, 742 F.3d at 1302 (noting that "whether the charges against [the defendants] formed part of the same course of conduct is not determinative of when an entrapment defense applies to all counts or must be assessed separately by the trier of fact as to each count").

4.      *Mayweather Did Not Meet the Burden of Production as to Inducement*

Mayweather initiated contact with Woodard after she received his phone number from another participant in the scheme.  Woodard told her during this call that they would be "mov[ing]" drugs.  As with Tucker, there is no evidence that Woodard pressured Mayweather or manipulated her by appealing to non-criminal motives.  And when Mayweather subsequently showed up for the transport, Woodard confirmed with her that she was not being "forced" to participate.  In other words, there was simply no "plus" that the government presented to Mayweather beyond the "opportunity" to commit a crime.  *See Groessel*, 440 F.2d at 605 ("There is no entrapment, however, if the accused is ready and willing to commit the crime whenever the opportunity might be afforded—even if by government agents or informers acting under their supervision.").  Rather, the evidence regarding Mayweather's contact with Woodard closely parallels the defendant in *Sistrunk*:

> [T]he[] facts present nothing more than evidence that the government presented the opportunity for Sistrunk to commit the crime.  While the opportunity presented may have been attractive to Sistrunk and his co-defendants, that is not sufficient to show inducement.  The record reveals no evidence of any actions or statements that would rise to the necessary level of excessive pressure or manipulation.

*Sistrunk*, 622 F.3d at 1333–34 (citing *United States v. West*, 898 F.2d 1493, 1502 (11th Cir. 1990)).  Therefore, Mayweather failed to meet her burden of production and was not entitled to an entrapment instruction.

26

5.    *The Government's Arguments That the Defendants Were Ineligible for Entrapment Defenses Are Unavailing*

On the other hand, the government contends that these defendants, having been recruited by other co-defendants rather than a government agent, at most can claim "derivative entrapment," which our circuit does not recognize. *See Isnadin*, 742 F.3d at 1308. Alternatively, the government argues that, even if the defendants were entitled to pursue an entrapment defense, any error in the failure to so instruct the jury was harmless because the defendants were not entrapped as a matter of law. We address each argument in turn.

First, in support of its derivative entrapment argument, the government primarily relies on *Isnadin*, where a government agent met with two defendants to arrange an armed robbery of a drug stash house. *See id.* at 1286–87. The agent allowed the defendants to bring other individuals to help with the job. *See id*. at 1288. When the defendants met the agent at the sting operation, Isnadin was one of the additional individuals the defendants brought with them for the job. *See id*. at 1291–92. Isnadin was arrested along with the primary defendants and charged similarly. *See id*. at 1284–85. We rejected Isnadin's assertion that he was entrapped because "[t]he law of this circuit is that '[a] defendant cannot avail himself of an entrapment defense unless the initiator of *his* criminal activity is acting as an agent of the [G]overnment.'" *Id*. at 1308 (quoting *United States v. Mers*, 701 F.2d 1321, 1340 (11th Cir. 1983)). Because Isnadin had been brought to

27

the sting by the defendants and not the government, and because the government had no knowledge of, or contact with, Isnadin before he arrived at the sting operation, we held that Isnadin could not pursue an entrapment defense. *Id.* at 1308–09.

Unlike *Isnadin*, however, this case does not involve derivative entrapment.[19] In *Isnadin*, the government had no contact with and did not present the criminal opportunity to the defendant because it was not aware of his involvement until he showed up on the day of the crime. *Id.* at 1291, 1308. But in the case at hand, although the defendants may have been initially introduced to the government agent through other co-defendants, the government agent was aware of the participation of each defendant, had direct contact and communication with all of the defendants, presented the criminal opportunity to them directly, and was directly involved with each defendants' fake drug transports. *Isnadin* is thus distinguishable.

Second, the government argues that the evidence conclusively demonstrates that the defendants were not entrapped, and, therefore, any error in failing to give the entrapment instruction was harmless. But the government's position conflates

---

[19] We also distinguish this case from others the government cited, like *Chirinos*, where we found "no evidence" that the government agent induced the defendants. 112 F.3d at 1102. Here, there is evidence of government inducement for some of the defendants, as discussed above.

28

the preliminary question of whether there was a sufficient evidentiary foundation for an entrapment defense such that the defendants had a right to have the jury instructed on that theory of defense, which is before us, with the ultimate legal question of whether the defendants were entrapped, which is not before us.[20] Where the answer to the preliminary question is yes, "the defendant is entitled to have his defensive theory of the case put before the jury with appropriate instructions from the trial judge," *Ryan*, 289 F.3d at 1344, and the ultimate question of whether the evidence demonstrates that the defendants were entrapped is for the jury, *Mathews*, 485 U.S. at 63. *See also Ruiz*, 59 F.3d at 1154 ("A criminal defendant has the right to have the jury instructed on [his] theory of defense, separate and apart from instructions given on the elements of the charged offense. A trial court may not refuse to charge the jury on a specific defense theory where the proposed instruction presents a valid defense and where there has been some evidence adduced at trial relevant to that defense." (internal citations omitted)). Indeed, where there is any foundation to support an entrapment defense, the jury should be given an opportunity to consider the defense "even though the

---

[20] For example, the government argues that all defendants were given a chance to back out of the deal and thus cannot have been induced. But "[e]vidence that a defendant was afforded an opportunity to back out of a transaction and did not avail himself of that opportunity also constitutes evidence of predisposition," not inducement. *United States v. Ventura*, 936 F.2d 1228, 1231 (11th Cir. 1991). So too with the argument that the defendants "eagerly agreed" to participate, and thus these arguments are jury issues. *See United States v. Andrews*, 765 F.2d 1491, 1499 (11th Cir. 1985) ("Evidence of predisposition may also include the readiness or eagerness of the defendant to deal in the proposed transaction.").

29

evidence may be weak, insufficient, inconsistent or of doubtful credibility." *Timberlake*, 559 F.2d at 1379 (quoting *United States v. Young*, 464 F.2d 160, 164 (5th Cir. 1972)).

Here, as discussed above, Fluellen and Williams met this threshold light burden and should have been given, but were denied, the opportunity to present the theory of entrapment as a defense. This error was reversible error, not harmless error, because a defendant has the right to have the jury instructed on the defense of entrapment where an evidentiary foundation exists, the defense of entrapment was not covered by other jury instructions, and the absence of the entrapment instruction seriously impaired their ability to present their defense. *See Ruiz*, 59 F.3d at 1154; *Bagnell*, 679 at 835 (holding that a failure to give an entrapment instruction where defendant met his burden of production was reversible error); *United States v. Garcia*, 546 F.2d 613, 615 (5th Cir. 1977) ("Even if the evidence is unsubstantial that entrapment has occurred, and even if it is the defendant's testimony alone which raises the issue, any evidence that 'the Government's deception actually implant(ed) the criminal design in the mind of the defendant,' *requires a charge to the jury on the defense of entrapment*." (emphasis added and internal citations omitted) (quoting *United States v. Russell*, 411 U.S. 423, 436 (1973))).

Accordingly, we reverse the district court on the entrapment issue as to Fluellen and Williams.

B.     The *McDonnell* Instruction

The second issue raised by the defendants concerns the jury instructions given on the counts for Hobbs Act extortion, codified at 18 U.S.C. § 1951.  That section, in relevant part, reads as follows:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
> . . .
> (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

18 U.S.C. § 1951.  The Supreme Court has explained that the "under color of official right" language in the statute gives rise to a requirement that the defendants perform an "official act."  *See, e.g.*, *Evans v. United States*, 504 U.S. 255, 268 (1992) (holding that the government was required to prove a quid pro quo existed—meaning an official accepted something of value in exchange for agreeing to take or taking official acts to qualify as Hobbs Act extortion).  Thus, the government must prove that the defendants took or agreed to take an "official act" to meet their burden of proving Hobbs Act extortion convictions.  *See id.*

31

In this case, the defendants requested that the district court instruct the jury as to the meaning of "official act" by using the pattern jury instructions promulgated by this Court.[21]  These instructions, in their current form (with the most recent revisions italicized), contain the following discussion of "official act":

> "Extortion under color of official right" is the wrongful taking or receipt of money or property by a public officer who knows that the money or property was taken or received in return for [doing] [not doing] an official act.  It does not matter whether or not the public officer employed force, threats, or fear.  *To qualify as an official act, the public official must have [made a decision or taken an action] [agreed to make a decision or take an action] on a question, matter, cause, suit, proceeding, or controversy.*
>
> *Further, the question, matter, cause, suit, proceeding, or controversy must involve the formal exercise of governmental power.  It must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee.  It must also be something specific which requires particular attention by a public official.*
>
> *The public official's [decision or action] [agreement to make a decision or take an action] on that question, matter, cause, suit, proceeding, or controversy may include using [his/her] official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official.  But setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—is not an official act.*
>
> [It is not necessary that the public official actually make a decision or take an action.  It is enough that [he/she] agrees to do so.  The

_____

[21]  For many years, our pattern jury instructions did not contain a definition of "official act."  Then, in December of 2016, a revision to these instructions was promulgated by this Court to reflect the Supreme Court's ruling in *McDonnell*, 136 S. Ct. at 2365.  *See* Eleventh Circuit Pattern Jury Instructions December 2016 Revisions, O70.2 (Color of Official Right).

agreement need not be explicit, and the public official need not specify the means [he/she] will use to perform [his/her] end of the bargain. Nor must the public official in fact intend to perform the official act, so long as [he/she] agrees to do so.]

Eleventh Circuit Pattern Jury Instructions, O70.2 (2019) (emphasis added). The district court, however, declined to give the pattern instruction and provided no definition as to the meaning of "official act" as applied to this case. The defendants argue that the district court erred by refusing to give the pattern instruction and by providing no definition of "official act" in the instruction that it ultimately provided.

### 1. The District Court Did Not Abuse Its Discretion by Refusing to Give the Post-McDonnell Pattern Jury Instruction

The defendants requested that the district court instruct the jury with the post-*McDonnell* pattern instruction. The district court rejected this request because it found that the post-*McDonnell* pattern instruction did not "fit[] the facts of this case." "We . . . review for abuse of discretion a district court's refusal to give a requested jury instruction." *Van Buren*, 940 F.3d at 1200. In particular, a district court may refuse to give a confusing jury instruction, *Rodriguez-Suarez*, 856 F.2d at 140; *see Silverman*, 745 F.2d at 1396, and "the charge as a whole [must] accurately reflect[] the law in the context of a case's facts," *Isnadin*, 742 F.3d at 1296.

33

In *McDonnell*, the Supreme Court addressed the necessity of a jury instruction on the meaning of official act for purposes of the Hobbs Act extortion statute. *See* 136 S. Ct. at 2365, 2367–68. *McDonnell* concerned the former Governor of Virginia's convictions for Hobbs Act extortion under color of official right and honest services fraud arising from his conduct in agreeing to arrange meetings with state officials and encouraging the state's research universities to conduct certain studies in exchange for loans and gifts. *See id.* at 2361. The parties in *McDonnell* agreed to use the federal bribery statute, 18 U.S.C. § 201(a)(3), to define what constituted an "official act" related to the charges against the governor under the Hobbs Act extortion statute. 136 S. Ct. at 2365. That statute defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding, or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id.* (quoting 18 U.S.C. § 201(a)(3)). Based on the text of § 201, the Supreme Court concluded that there were two requirements for an act to constitute an "official act":

> First, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official. Second, the Government must prove that the public official made a decision or took an action "on" that question, matter, cause, suit, proceeding, or controversy, or agreed to do so.

34

*Id*. at 2368.  Under this rubric, the Supreme Court held that the "question" or "matter" must be a "formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination."  *Id*. at 2368–69.  The Supreme Court also held that the matter must be "pending," which meant it had to be "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete," and should also be something "within the specific duties of an official's position—the function conferred by the authority of his office."  *Id*. at 2369.

Following *McDonnell*, this Circuit incorporated the "official act" definition from *McDonnell* into its pattern jury instructions for Hobbs Act extortion.  It was the *McDonnell* definition of "official act" that the defendants sought to use at trial in this case.  But, as the government pointed out at trial, the post-*McDonnell* pattern instruction also requires the act to involve a formal exercise of governmental power "similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee."  The government argued that this portion of the instruction would be misleading here because a jury could be confused by the references to lawsuits and hearings—formal exercises of governmental power that are not at issue here.

We agree.  The post-*McDonnell* pattern instruction states that the "question, matter, cause, suit, proceeding, or controversy . . . must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a

35

committee." *See* Eleventh Circuit Pattern Jury Instructions, O70.2 (2019). Unlike *McDonnell*, which involved a governor, this case involves corrections officers who possess different governmental powers. Accordingly, the post-*McDonnell* pattern instruction could be misleading upon the facts of this case because formal exercises of governmental power similar to—but other than—"a lawsuit before a court, a determination before an agency, or a hearing before a committee," can qualify as a "question, matter, cause, suit, proceeding, or controversy," and the district court did not abuse its discretion by failing to give the pattern instruction.

2.     *The District Court Was Required to Define "Official Act"*

The district court did not define "official act" in the charge it provided the jury and the defendants argue that its failure to do so was error. Although the district court did not abuse its discretion by finding that the post-*McDonnell* pattern instruction of "official act" does not fit the facts of this case, it was still required to define "official act" because of the constitutional concerns underlying the *McDonnell* decision. The Supreme Court explained those concerns as follows:

> In addition to being inconsistent with both text and precedent, the Government's expansive interpretation of "official act" would raise significant constitutional concerns. Section 201 prohibits *quid pro quo* corruption—the exchange of a thing of value for an "official act." In the Government's view, nearly anything a public official accepts—from a campaign contribution to lunch—counts as a *quid*; and nearly anything a public official does—from arranging a meeting to inviting a guest to an event—counts as a *quo*.

36

> But conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time. The basic compact underlying representative government assumes that public officials will hear from their constituents and act appropriately on their concerns—whether it is the union official worried about a plant closing or the homeowners who wonder why it took five days to restore power to their neighborhood after a storm. The Government's position could cast a pall of potential prosecution over these relationships if the union had given a campaign contribution in the past or the homeowners invited the official to join them on their annual outing to the ballgame. Officials might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse.

*McDonnell*, 136 S. Ct. at 2372. The Supreme Court also noted that "under the Government's interpretation, the term 'official act' is not defined 'with sufficient definiteness that ordinary people can understand what conduct is prohibited,' or 'in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id*. at 2373 (quoting *Skilling v. United States*, 561 U.S. 358, 402–403 (2010)). Finally, the Supreme Court acknowledged that "[t]he Government's position also raises significant federalism concerns. A State defines itself as a sovereign through 'the structure of its government, and the character of those who exercise government authority.' That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents." *Id*. (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

All of the Supreme Court's concerns about the government's expansive definition of "official act"—lawful interactions between state officials and

37

constituents, vagueness, and federalism—are equally applicable to this case and establish the importance of giving guidance to the jury by defining the alleged "official act" at issue in each Hobbs Act extortion case. The concerns highlighted in *McDonnell* are only heightened when, as here, no definition *at all* for "official act" is given. *Cf. Van Buren*, 940 F.3d at 1203 (reversing convictions of police officer where district court refused to give entire pattern jury instructions about "official acts" because of concerns that lack of pattern instruction examples could cause jury confusion). Accordingly, the district court's failure to instruct the jury on "official act" in this Hobbs Act extortion case was error.

Having determined that the jury charge as given was erroneous, we now consider whether it requires a reversal. "An erroneous jury charge only entitles the defendant to reversal of his conviction and remand for a new trial on the count in question when a reasonable likelihood exists that the jury applied the instruction in an improper manner." *Chirinos*, 112 F.3d at 1096. Here, we find that a reasonable likelihood exists that the jury applied the instruction in an improper manner. The government argued to the jury in closing that "[t]he uniform when donned is the official act which the Defendants used as a quid pro quo . . . ." It is true that corrections officers are officers of the state of Georgia. *See* O.C.G.A. § 42-5-31. However, a corrections officer's powers, such as his arrest power, are limited to the bounds of the prison facilities except when transporting inmates or when

38

specifically requested to aid law enforcement officers.  *See* O.C.G.A. §§ 42-5-34, 42-5-35.  Therefore, simply wearing a GDC uniform outside the bounds where the GDC employee has lawful authority to act is not an official act.  *See McDonnell*, 136 S. Ct. at 2371–72 (defining official act as a "formal exercise of governmental power").  The government, however, has argued that, according to *McDonnell*, intending to exert pressure on another official performing an official act could possibly qualify as an official act.  *See id.* at 2372.  It is possible, then, that these corrections officers were committing an official act if they were wearing the uniforms in an attempt to influence the actions of police officers they encountered during transports.  But whether the corrections officers were attempting to influence police officers is a factual question that requires a jury, properly instructed as to the meaning of "official act" and with the benefit of arguments from all parties, to answer.[22]  *See Van Buren*, 940 F.3d at 1205 (remanding case for a properly instructed jury to decide if police officer committed official act as required for bribery charge).  Accordingly, because the district court's failure to

---

[22]  The government argues that the indictment defined the official acts in question and the jury instructions referred to the indictment, such that any error in failing to define the meaning of "official act" specifically in the jury instructions was harmless.  We are unpersuaded.  While the indictment specified that the defendants agreed to wear their uniforms on the transports and believed their uniformed presence would assist with the successful transportation of narcotics and prevent "law enforcement interdiction," the indictment never specifically defined "official act."  Indeed, the phrase "official act" does not appear at all in the indictment.  Thus, the indictment did not help give the jury any guidance as to what the meaning of official act was in this case for purposes of the Hobbs Act extortion charges.  Accordingly, the error was not harmless.

define "official act" in its jury instruction was a misstatement of the law that deprived the defendants of a fair trial, we reverse all four defendants' Hobbs Act extortion convictions on this issue and remand for a new trial.

On remand, the district court will have broad discretion in fashioning a jury instruction that fits the facts of this case. *See United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000). To aid the district court in doing so, we note that the post-*McDonnell* pattern instruction is a correct statement of law but that the portion of the instruction that could be confusing as applied to this case is the phrasing of the requirement that the "question, matter, cause, suit, proceeding, or controversy" at issue "must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." We also note that a police officer's determination whether to search a suspect involves "a formal action of the same gravity as a lawsuit, hearing, or administrative determination."[23] *See Van Buren*, 940 F.3d at 1204.

## IV.    Conclusion

Because Williams and Fluellen were entitled to a jury instruction on the defense of entrapment, which was omitted below, we reverse their convictions and remand for a new trial as to the two of them. Further, we reverse all of the

---

[23] We leave the question of whether defendants performed an official act to the fact-finder on remand.

defendants' Hobbs Act extortion convictions and remand for a new trial because they were denied a fair trial when the jury was not instructed on the meaning of "official act" for those counts.  We affirm, however, Mayweather's and Tucker's respective drug-related convictions because they were not entitled to an entrapment instruction and the validity of their drug-related convictions is not affected by our holding as to the Hobbs Act extortion counts.

**AFFIRMED in part; REVERSED in part; REMANDED**.