[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13867

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

FREDERICK BUSH,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cr-00016-RH-MAF-1

_____

Before ROSENBAUM, NEWSOM, and TJOFLAT, Circuit Judges.

NEWSOM, Circuit Judge:

Frederick Bush was convicted of escaping from a residential-reentry center in violation of 18 U.S.C. §§ 751(a) and 4082(a).  On appeal, he argues, among other things, that the district court improperly instructed the jury regarding the mens rea required to convict him.  We agree and therefore vacate and remand for a new trial.

**I**

Bush left the Keeton Residential Reentry Center in Tallahassee, Florida, before completing his required stretch.  The government indicted Bush on a single count of "knowingly escap[ing] from [] custody . . . by willfully failing to remain within the extended limits of his confinement and failing to remain at" Keeton.  Doc. 18 at 1.  Importantly here, the indictment cited two criminal statutes: 18 U.S.C. §§ 751(a) and 4082(a).  *Id.* at 2.  Section 751(a) generally prohibits "escap[ing] or attempt[ing] to escape from . . . custody," and § 4082(a) explains, more particularly, that the "willful failure of a prisoner to remain within the extended limits of his confinement, or to return within the time prescribed . . . shall be deemed an escape."

22-13867                Opinion of the Court                3

Following a *Faretta* hearing, Bush elected to represent himself at trial.[1] Joseph Debelder was appointed standby counsel, and he has represented Bush on appeal.

We needn't recite the case's full procedural history, chapter and verse. But it will be useful to recap the portions that bear on the mens rea issue that underlies Bush's jury-instruction challenge. Before and during trial, and leading up to the jury charge, the parties and the district court had numerous exchanges regarding what the government needed to prove about Bush's mental state in order to convict him. In short, Bush—who, again, was proceeding *pro se*—consistently asserted that he left Keeton because an employee there had threatened him and that he didn't know that by leaving he was violating the law. The government and the district court consistently responded that it didn't matter—that Bush didn't have to know he was violating the law, just that he didn't have permission to leave.

So, for instance, prior to trial, the government filed a brief clarifying its position regarding the mens rea issue. It acknowledged that Bush could present evidence that he lacked the requisite intent when he left Keeton. Importantly, though, relying on *United States v. Bailey*, 444 U.S. 394 (1980), the government asserted that

---

[1] *Faretta v. California* held that a criminal defendant has a constitutional right to represent himself provided that his waiver of the right to counsel was knowing, voluntary, and intelligent. *See* 422 U.S. 806, 835 (1975).

§ 751(a) required it to prove only that Bush "knew his actions would result in leaving physical confinement without permission."

During a pre-trial discussion about his witness list, Bush informed the district court that he planned to present a duress-based affirmative defense that he left Keeton because an employee there had threatened him. Bush told the court that he intended to call that employee, who, he said, was "definitely part of the case." The district court denied Bush's request: "The case is: You were in custody at Keeton; you left without permission; they found you somewhere else." Bush responded that the government had to prove that he had "intent and knowledge" regarding "an offense that's against the law." Wrong, the court said: "The knowledge is that you were in custody under a federal sentence and that you didn't have permission to leave. And the intent is that . . . you meant to leave. That's the only intent that's required." Bush rejoined: "The intent has to be to commit . . . an offense that's against the law." The court: "Nope . . . not so."

Bush persisted, and, in support of his position, directed the district court to *United States v. Kelley*, 546 F.2d 42 (5th Cir. 1977). Bush called *Kelley* "a 751 case," and said that it required proof of specific intent. Reading from the opinion, Bush stated:

> Knowingly is to be aware or to do an act to accomplish an intended result or goal with knowledge, willfully and intentionally. An act is done willfully and knowingly if done with knowledge and specific intent. Specific intent, as the terms implies, means more than a general intent to commit the act. To

> establish specific intent beyond a reasonable doubt, the government must prove that a defendant knowingly did an act that the law forbids or knowingly failed to do an act which the law requires, purposely intending to violate the law.

Bush insisted that this was "the intent required under 751."

Asked for its position about whether it needed to prove that Bush knew that he violated the law when he left Keeton, the government responded that it did not.

During his opening statement, Bush told the jury that the evidence would show that employees at Keeton mistreated him and his family and that they retaliated against him "because of abuse of power and discretion." The court intervened and explained to the jury that "[t]he question in the case is simply whether [Bush] was lawfully in custody of a federal facility, whether he left the facility knowing that he didn't have permission and wasn't allowed to leave."

As relevant here, the government called Latoya Green, a case manager at Keeton. Green testified that when Bush arrived at the center she had presented him with an "intake packet" that explained the facility's rules and regulations. The packet's last page briefly mentioned that a "willful failure of a prisoner to remain within the extended limits of his confinement" would be deemed an "escape." Bush, she said, reviewed this material on a computer screen. The government also called Paul Joanos, Jr., an assistant chief deputy with the U.S. Marshal Service. He testified that after

receiving a report that Bush had left Keeton, he tracked Bush down and called him.  He told Bush that he had "24 hours" to turn himself in, on pain of "prosecution for escape."

In his defense, Bush first called his fiancée, Yashica Miller. After sustaining several of the government's objections to Bush's questioning of Miller, the district court told the jury that "[t]he issue in the case is whether [Bush] was in custody on June 21st and intentionally left custody on June 21st from the halfway house as charged."  "We are dealing," the court said, "with . . . whether he left the facility on June 21st and, if so, whether he did that intentionally."  Bush then called Lewgene Meeks, a one-time Keeton resident.  Meeks testified that he didn't recall any discussion about "notice pertaining to the escape statute" during the intake process, but he admitted that he knew he couldn't leave Keeton without permission.

Bush then testified in his own defense.  When he attempted to explain the sequence of events leading up to his departure from Keeton and his reasons for leaving, the government objected.  The district court sustained the government's objection, telling Bush that while he could testify to whether he was in custody at Keeton, he couldn't get into "how [he was] treated there, whether it was fair or unfair."  The court then gave the following explanation to Bush and the jury, in which it clarified its understanding of the mens rea issue:

22-13867                Opinion of the Court                7

> The question that the jury is going to be called upon to answer is whether Mr. Bush was in custody as of June 21st at Keeton . . . .
>
> The question is whether he's required to be there, whether he's got permission to leave, whether he knows he is required to be there and doesn't have permission to leave. And if he knew he was required to stay and didn't have permission to leave, then the question is whether he left.
>
> A person is not allowed to leave a prison or a correctional facility or a halfway house because the person doesn't think he's been treated fairly there. And so the question is not what happened on [June] 17th or 18th and what discipline there was and whether it was fair or unfair. Those are questions for some other tribunal on some other occasion, some other day.
>
> This federal trial under the escape statute is a trial to determine whether Mr. Bush was in custody at the halfway house, whether he knew it, whether he knew he couldn't leave without permission, and whether he left anyway. Those are the questions the jury is going to be called upon to answer.

Bush proceeded to testify that when he left Keeton he didn't think he was committing escape. Moreover, he added, he wouldn't have left "had [he] known [that he] was going to be charged with an escape." Bush said that he wasn't thinking clearly when he left but that he had a justifiable reason for doing so.

After the close of the evidence, the parties discussed the jury instructions. Bush complained that the district court's proposed instructions didn't properly inform the jury about the mens rea element of the charged crime. He asserted that the offense's knowledge element required proof that he knew his conduct amounted to escape. The court again disagreed: "You are wrong about that, and you can tell it to the appellate court."

The district court ultimately gave the jury the following instruction, the "third" part of which is particularly pertinent to the issue before us:

> Mr. Bush can be found guilty only if all these facts have been proved beyond a reasonable doubt:
>
> First, as of June 21, 2021, Mr. Bush was in custody at the Keeton facility serving a sentence imposed by a federal court.
>
> Second, the Keeton facility was under contract with the Attorney General, the Department of Justice, or the Bureau of Prisons to maintain custody of individuals serving federal sentences.
>
> And, third, Mr. Bush knew he was not allowed to leave the facility without permission but intentionally left the facility anyway.

The court clarified for the jury that, although Bush asserted that "he did not know leaving the facility, even without permission, would constitute the crime of escape," the government didn't need to prove that Bush knew the law of escape; rather, the court said, it

was enough for the government to prove, more generally, that Bush knew that he wasn't allowed to leave the facility without permission.

The jury found Bush guilty. Bush subsequently moved for a new trial. He contended, among other things, that the jury instructions deprived him of a fair trial because § 4082(a)—one of the statutes under which he was convicted—required a showing of "willful[ness]" and because the district court's jury instructions failed to include that requirement. The district court denied Bush's motion and subsequently sentenced him to 37 months' imprisonment.

This is Bush's appeal.

## II

Ordinarily, we review the legal correctness of a jury instruction de novo, and the district court's phrasing or refusal to give a requested instruction for abuse of discretion. *See United States v. Mayweather*, 991 F.3d 1163, 1174 (11th Cir. 2021). If a district court's instruction was legally erroneous, the defendant is entitled to reversal unless the error was harmless beyond a reasonable doubt. *See United States v. Ruan*, 56 F.4th 1291, 1296 (11th Cir. 2023).

When a defendant raises an issue for the first time on appeal, however, we will review only for plain error. Under that standard, the defendant must prove an "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Whyte*, 928 F.3d 1317, 1331 (11th Cir. 2019) (quotation marks and citation omitted). We may then exercise our discretion to reverse if the error "seriously

affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation omitted). On plain-error review, we will reverse a conviction based on an allegedly erroneous instruction only if it was an "incorrect statement of the law and . . . was probably responsible for an incorrect verdict, leading to substantial injustice." *Id.* at 1331–32 (citation omitted). If we conclude that the challenged instruction would "mislead the jury or leave the jury to speculate as to an essential point of law, the error is sufficiently fundamental to warrant a new trial despite a party's failure to state a proper objection." *Montgomery v. Noga*, 168 F.3d 1282, 1294 (11th Cir. 1999) (quotation marks and citation omitted).

On appeal, the parties dispute whether Bush properly preserved the jury-instruction issue for our review. Because we conclude that Bush can meet even the heightened plain-error burden to demonstrate that the instruction was not only erroneous but also "probably responsible" for an incorrect verdict, we needn't decide the preservation question.

### III

To repeat, the government charged Bush in a single-count indictment with violating 18 U.S.C. §§ 751(a) and 4082(a). In relevant part, § 751(a) prohibits any individual from "escap[ing] or attempt[ing] to escape from . . . custody." Section 4082(a), in turn, clarifies that the "willful failure of a prisoner to remain within the extended limits of his confinement, or to return within the time prescribed . . . shall be deemed an escape." Section 751(a)'s text doesn't expressly include a mens rea requirement, but the Supreme

Court in *Bailey* construed § 751(a) to require proof that a defendant "knew his actions would result in his leaving physical confinement without permission." 444 U.S. at 408. Section 4082(a) is different—it explicitly requires proof that the defendant acted "willful[ly]."

Importantly, Bush's indictment cited both statutes and, in fact, drew upon language from both. Specifically, it alleged that Bush "knowingly escape[d]" by "willfully failing to remain" at Keeton, in violation of §§ 751(a) and 4082(a). And indeed, at oral argument, the government acknowledged that it "chose" to charge the case under both statutes. *See* Oral Arg. at 14:30 *et seq.*

On appeal, Bush argues that the district court's jury instructions misstated the mens rea necessary to convict him. While the pertinent instruction required the government to prove that Bush knew that "he was not allowed to leave the facility without permission," it failed to specify, as Bush insists it should have, that he had to know, more specifically, that his actions were *unlawful*.

The government responds that the court's instruction was correct under § 751(a). Perhaps, but that's not a full answer. As already explained, the government opted to indict Bush, in a single count, for violating *both* § 751(a) *and* § 4082(a). Accordingly, the instruction also needed to address § 4082(a)'s "willful[ness]" requirement. It did not. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 12 (1999) (observing that "a jury instruction that omits an element of the offense" charged is indisputably "error"); *United States v. Gaudin*, 515 U.S. 506, 510 (1995) (holding that the Constitution "require[s] criminal convictions to rest upon a jury determination that

the defendant is guilty of every element of the crime with which he is charged").

Although we have never expressly addressed the meaning of the word "willful" as used in § 4082(a), we aren't without meaningful guidance.  The old Fifth Circuit addressed both § 751(a) and § 4082(a) in *United States v. Brackett*, 582 F.2d 1027, 1027–28 (5th Cir. 1978).  To be sure, the issue there was about sufficiency of the evidence rather than the propriety of a jury instruction.  Even so, the court explained that "[u]nder the statutes charged in the indictment, the crime of 'escape' or 'failure to return' includes an element of volition, i.e., the [g]overnment must show that the accused failed to return *'knowingly,' 'willfully'* and *'unlawfully.'*" *Id.* at 1028 (emphasis added).

The Supreme Court has likewise addressed the use of the word "willful," albeit in other contexts and statutes.  In *Bryan v. United States*, for example, the Court held that while willfulness doesn't necessarily require proof that the defendant knew the specific provision of law that he was violating, it does require proof that he knew that his conduct was unlawful.  *See* 524 U.S. 184 (1998).  Importantly for present purposes, the Court there specifically differentiated "knowingly" from "willfully"—explaining that "the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense" whereas the term "willfully" requires proof of "knowledge that [the] conduct was unlawful." *Id.* at 192–93, 196.

The Eleventh Circuit Pattern Jury Instructions reinforce these common understandings. They define a "willful" act, as a general matter, as one "committed voluntarily and purposely, with the intent to do something the law forbids; that is, with the bad purpose to disobey or disregard the law." Pattern Crim. Jury Instr. 11th Cir. BI B9.1A (2020). Echoing *Bryan*, the pattern instructions explain that while the defendant "need not be aware of the specific law or rule" that he is violating, he must have committed the charged offense "voluntarily and purposely with the intent to do something unlawful." *Id.*[2]

These sources leave us with little doubt that, as used in § 4082(a), the term "willful" requires more than the district court's jury instruction did here. Although the instruction stated that Bush had to have known that he was "not allowed" to leave Keeton "without permission," it didn't specify that he had to have acted "unlawfully," or with an intent to do something "that the law forbids." In fact, it said just the opposite.

We therefore hold that the district court erred and that its error was plain. We further hold that the challenged instruction

---

[2] The pattern instructions recognize a second, more specific use of the term "willful," which requires proof that the defendant "had an intent to violate a known legal duty." Pattern Crim. Jury Instr. 11th Cir. BI B9.1A (2020). This latter definition is typically used in connection with tax and other technical statutes. No one here seems to dispute that, if anything, Bush's case falls into the first, more general category.

14                    Opinion of the Court                    22-13867

was "probably responsible for an incorrect verdict." *Whyte*, 928 F.3d at 1331–32. It's difficult to imagine an issue more central to a finding of criminal responsibility than mens rea. If the government can't prove that the defendant acted with the requisite state of mind, the defendant is entitled to an acquittal. And the district court's instruction here at least implicitly allowed the jury to convict Bush without proof of the necessary proof of "willful[ness]." When an instruction is likely to "mislead the jury or leave [it] to speculate as to an essential point of law, the error is sufficiently fundamental to warrant a new trial despite a party's failure to state a proper objection." *Noga*, 168 F.3d at 1294.[3]

★   ★   ★

Because the district court erred when it omitted from its jury instruction the requirement that the government prove that Bush acted "willful[ly]," we vacate and remand for a new trial. And

---

[3] The government argues that the district court's error wasn't "probably responsible for an incorrect verdict" because Bush became aware that his conduct was unlawful when speaking with a deputy on the phone after he left Keeton. *See Whyte*, 928 F.3d at 1331–32. We are unpersuaded. Though the conversation with the deputy arguably indicates a measure of knowledge that Bush's conduct was unlawful *after* he left Keeton, it doesn't show that he knew his action was unlawful *when* he left—*i.e.*, that he "knowingly left" and "willfully failed to remain," as the indictment alleged.

22-13867                Opinion of the Court                15

because we vacate on the jury-instruction issue, we needn't address Bush's remaining contentions.

**VACATED AND REMANDED.**